257 P.3d 551 (2011)
171 Wash.2d 667
STATE of Washington, Respondent,
v.
Kevin L. MONDAY, Jr., Petitioner.
No. 82736-2.
Supreme Court of Washington, En Banc.
Argued May 11, 2010.
Decided June 9, 2011.
*552 Nancy P. Collins, Washington Appellate Project, Seattle, WA, for Petitioner.
Brian Martin McDonald, King County Prosecutor's Office, Seattle, WA, for Respondent.
Johanna Rowton Pirko, Attorney at Law, Sarah A. Dunne, Nancy Lynn Talner, ACLU of Washington Foundation, Seattle, WA, amicus counsel for ACLU Washington Foundation.
CHAMBERS, J.
¶ 1 Kevin L. Monday Jr. was convicted of one count of first degree murder and two counts of first degree assault stemming from a shooting in Pioneer Square, Seattle, Washington. We granted review limited to two issues: whether prosecutorial misconduct deprived Monday of a fair trial and whether imposition of firearm enhancements violated Monday's jury trial right. Finding that his trial was fatally tainted by prosecutorial misconduct, we reverse.

FACTS AND PROCEDURAL HISTORY
¶ 2 A street musician was playing drums in Seattle's popular Pioneer Square early one Sunday morning in April 2006. He had mounted a digital video camera on his equipment. The camera captured a confrontation between several men, including one in a distinctive, long red shirt. The confrontation seemed to break up. Then, the red shirted man suddenly pulled out and rapidly fired a pistol as he walked backward and then as he turned and ran.
¶ 3 Francisco Green was shot four times. Two other men were also shot, though both survived. Green died upon arrival at the nearby Harborview Medical Center.
¶ 4 Once he was home, the street musician, who had wisely dropped to the ground when the shooting started, realized he had recorded the shooting. He gave the recording to the police that same day. Shortly after the shooting, a witness stopped an officer on the street to offer a description of the shooter and his very recent location. Following that tip, the officer found Antonio Saunders. Out of Saunders's hearing, the witness confirmed Saunders was the man he believed had committed the shooting, and the officer arrested Saunders for violating probation. Ultimately, Saunders told one of the homicide detectives investigating the murder that he saw Monday fire his gun at Green. Another witness picked Monday and another man out of a photomontage as possible shooters. Many of the other witnesses were more reluctant to *553 cooperate or gave inconsistent responses to investigators. One witness gave a physical description of the shooter.
¶ 5 Monday was arrested three weeks after the murder. He was wearing a red shirt and hat that were strikingly similar to the ones in the video. He initially told the investigators that he had not been to Pioneer Square for years. After being shown some still shots from the video of people he knew, Monday admitted he had been to Pioneer Square recently, admitted he had gotten into a fight, and admitted that he heard a gun being fired. He denied that he had fired a gun himself. When the police showed Monday a picture of himself in a photographic still from the musician's video, Monday acknowledged it was him.
¶ 6 Not long afterward, the police suggested that they had found Monday's DNA (deoxyribonucleic acid) and fingerprints on shell casing recovered at the scene. This was not, in fact, true. Shortly afterward, Monday began to cry and said that "I wasn't trying to kill that man, I didn't mean to take his life." Verbatim Report of Proceedings (VRP) (May 29, 2007) at 32-33. Police searched Monday's home and found .40 caliber bullet cartridges and a gun holster. The gun was not recovered.
¶ 7 Monday was charged with one count of first degree murder and two counts of first degree assault, all while armed with a handgun, and second degree unlawful possession of a firearm. Trial began in April 2007 and lasted a month. During his opening statement, Prosecutor James Konat told the jury that the State takes great measures to ensure that no one is falsely accused or falsely convicted. Monday's counsel objected on the grounds that the State is not supposed to vouch for the credibility of its witnesses or its case. Judge Michael Hayden sustained the objection and stressed that "at no time during the trial will anyone be expressing their personal views as to the guilt or their personal views as to the truth-telling of anyone who takes the witness stand." VRP (May 10, 2007) at 8. The judge also reminded counsel that it was not their place to give their views on the "credibility of a witness or the guilt of anyone." Id. at 7. Judge Hayden denied Monday's motion for a mistrial. He invited Monday to submit a curative instruction but acknowledged that "would simply highlight what was said." Id.
¶ 8 Witness credibility was particularly at issue because many of the State's witnesses were not enthusiastic proponents of the State's case. For example, Saunders testified he had only identified Monday as the shooter because he thought Monday had blamed him. Saunders's former girl friend, Adonijah Sykes, had also told investigators that Monday was the shooter. On the stand, she testified that she had lied to police investigators.
¶ 9 During Sykes's second day of testimony, the following exchange took place between her and the prosecuting attorney:[1]
Q. .... And would you agree or disagree with the notion that there is a code on the streets that you don't talk to the poleese?
A. I mean, that's what some people say. That's what some people go by.
Q. Well, can you help us understand who these some people are?
A. I'm sayingI'm just saying that's how some people is. Some people talk to the police, some don't.
Q. And you're one of those that don't, right?
A. I'm sayingwell, I don'tpolice ain't my friends or nothing.
....
Q. Does that mean that you're one of those people who don't talk to the police?
A. No, sometimes I don't talk to the po-leese. I mean, they got a question or something to ask me, I answer. I don't talk to them.
VRP (May 22, 2007) at 19. Monday did not immediately object to either the prosecutor's line of questioning or his potentially derogatory *554 pronunciation. The examination continued:
Q. Let me ask you this about your conversation with the poleese.
When did you figure out that that guy that got shot when you were on the corner on April 22nd, 2006[,] when did you find out that he was dead?
A. A couple weeks later.
Q. Really.
A. Yeah.
Mr. MINOR [defense counsel]: Objection, your honor.
Id. at 19-20. The judge asked, "Are you objecting to his tone of voice?" Id. at 20. When counsel demurred and said he was objecting to the comment itself, the judge said: "I think you're really objecting to the tone of voice that he's giving us. And I will ask him to try to ask your questions, let the jury decide whether this witness should be believed or not." Id. The prosecutor thanked the judge and continued. Not long after, the prosecutor used the term again:
Q. And fair to say that you didn't want your boyfriend to go to jail?
A. No.
Q. Right? And that's one of the reasons that you stayed away and tried to avoid the po-leese, right?
A. I just didn't want to have nothing to do with them.
Q. I mean, to beto go back over your testimony yesterday for just one moment, you never called the police and told them you saw what happened down there, did you?
A. No. A lot of people was down there didn't call the police.
Q. That's right. And that's what I was asking you about, there's a code on the streets that you don't call the poleese, right?
Id. at 22-23.
¶ 10 While Judge Hayden was clear that the prosecutor must refrain from any comments on the credibility of the witnesses, he was not without sympathy. He noted that "virtually every lay witness has been very reticent to testify in this case, and the memory of virtually every lay witness has had significant holes in places where one would not expect that they would have memory lapses." VRP (May 23, 2007) at 98.
¶ 11 Despite the court's earlier admonishment that it was not the State's role to vouch for the credibility of the State's witnesses or its case, in closing, the prosecutor argued:
Seventeen years and eleven months ago yesterday, I signed on, I signed on to serve at the pleasure of Norman K. Maleng. I never imagined in a million years I would get to try as many murder cases as I have in the last 15 years, and I never imagined I would ever get to try one, a doozy, like this one. Seventeen years and about ten months ago I started going to training sessions in the King County prosecutor's office on Saturday mornings that we just dreaded when we could be playing golf.... And two things stood out for me very shortly into my career as a prosecutor, two tenets that all good prosecutors, I think, believe. One is that when you have got a really, really, really strong case, it's hard to come up with something really, really, really compelling to say. And the other is that the word of a criminal defendant is inherently unreliable. Both of those tenets have proven true time and time again over the years, and they have done it specifically in this case over the last five weeksfour weeks.
I never imagined when I signed on to serve at the pleasure of Norm Maleng, this won't be the last murder case I will try, but it is the last one I will try under his name. I imagined I would call eight witnesses who simply will not or cannot bring themselves to admit what cannot be denied.
VRP (May 30, 2007) at 26-27. The prosecutor contended that Green was killed "for no reason. Francisco Green got killed because this messed up American male was trying to prove his macho. He stuck his nose in a fight that didn't have one damn thing to do with him." Id. at 28. The prosecutor acknowledged he was being selective in what part of his witnesses' testimony he wanted the jury to credit. He explained:

*555 [T]he only thing that can explain to you the reasons why witness after witness after witness is called to this stand and flat out denies what cannot be denied on that video is the code. And the code is black folk don't testify against black folk. You don't snitch to the police. And whether it was the guy who was down there helping Francisco Green, trying to keep this killer off of him, or whether it was the people that were working with this killer to try and get to Francisco Green, none of them could bring themselves to recognize what cannot be denied.
Id. at 29-30. He returned to this point again and again throughout his closing argument. E.g., id. at 35 ("And there is only one conceivable explanation for this, and it is called code."); id. at 37 ("all of those witnesses are protecting Kevin Monday. Why? It's the same thing I'm going to say over and over before I sit down. Code. It's all about the code.").
¶ 12 The jury found Monday guilty of one count of first degree murder and two counts of first degree assault. The jury also answered "yes" to each of the special verdict form questions asking whether Monday committed the crimes with a firearm.
¶ 13 Monday appealed on numerous grounds, including that the prosecutor made a blatant and inappropriate appeal to racial prejudice and undermined the credibility of African American witnesses based on their race. The Court of Appeals affirmed Monday's conviction and sentence finding, among other things, that the prosecutor made a blatant appeal to racial prejudice but that any error was harmless under this court's established jurisprudence. State v. Monday, noted at 147 Wash.App. 1049, 2008 WL 5330824. We granted review limited to whether prosecutorial misconduct deprived Monday of a fair trial and whether imposition of firearm enhancements violated Monday's jury trial right. State v. Monday, 166 Wash.2d 1010, 210 P.3d 1018 (2009).

ANALYSIS

1. Prosecutorial Misconduct
¶ 14 Prosecutorial misconduct is grounds for reversal if "the prosecuting attorney's conduct was both improper and prejudicial." State v. Fisher, 165 Wash.2d 727, 747, 202 P.3d 937 (2009) (citing State v. Gregory, 158 Wash.2d 759, 858, 147 P.3d 1201 (2006)). Instead of examining improper conduct in isolation, we determine the effect of a prosecutor's improper conduct by examining that conduct in the full trial context, including the evidence presented, "`the context of the total argument, the issues in the case, the evidence addressed in the argument, and the instructions given to the jury.'" State v. McKenzie, 157 Wash.2d 44, 52, 134 P.3d 221 (2006) (quoting State v. Brown, 132 Wash.2d 529, 561, 940 P.2d 546 (1997)). Generally the prosecutor's improper comments are prejudicial "`only where "there is a substantial likelihood the misconduct affected the jury's verdict."'" State v. Yates, 161 Wash.2d 714, 774, 168 P.3d 359 (2007) (quoting McKenzie, 157 Wash.2d at 52, 134 P.3d 221 (quoting Brown, 132 Wash.2d at 561, 940 P.2d 546)). This has been the standard in this state for at least 40 years. See State v. Music, 79 Wash.2d 699, 714-15, 489 P.2d 159 (1971), judgment vacated in part by, 408 U.S. 940, 92 S.Ct. 2877, 33 L.Ed.2d 764 (1972). It is not clear from Music where this standard came from.
¶ 15 A prosecutor serves two important functions. A prosecutor must enforce the law by prosecuting those who have violated the peace and dignity of the state by breaking the law. A prosecutor also functions as the representative of the people in a quasijudicial capacity in a search for justice. State v. Case, 49 Wash.2d 66, 70-71, 298 P.2d 500 (1956) (quoting People v. Fielding, 158 N.Y. 542, 547, 53 N.E. 497 (1899)).[2]
*556 ¶ 16 Defendants are among the people the prosecutor represents. The prosecutor owes a duty to defendants to see that their rights to a constitutionally fair trial are not violated. Id. at 71, 298 P.2d 500. Thus, a prosecutor must function within boundaries while zealously seeking justice. Id. A prosecutor gravely violates a defendant's Washington State Constitution article I, section 22 right to an impartial jury when the prosecutor resorts to racist argument and appeals to racial stereotypes or racial bias to achieve convictions.
¶ 17 Monday contends Prosecutor Konat injected racial prejudice into the trial proceedings by asserting that black witnesses are unreliable and using derogatory language toward a black witness, saying that "black folk don't testify against black folk." VRP (May 30, 2007) at 29-30. He contends that the prosecutor made a variety of improper comments during opening statements and closing argument, including referencing his personal credibility, invoking popular former King County Prosecutor Norm Maleng, attacking Monday's credibility, the credibility of the State's own witnesses, and commenting on the strength of the State's case. Monday also contends the prosecutor acted improperly by stating that all good prosecutors believe "the word of a criminal defendant is inherently unreliable" and by adding that it was true in the present case. Id. at 26-27. The State concedes that some of these statements were improper but argues that any error was either not preserved by objection or was harmless given the overwhelming evidence against Monday.
¶ 18 A "`[f]air trial' certainly implies a trial in which the attorney representing the state does not throw the prestige of his public office ... and the expression of his own belief of guilt into the scales against the accused." Case, 49 Wash.2d at 71, 298 P.2d 500 (citing State v. Susan, 152 Wash. 365, 278 P. 149 (1929)). Turning first to the general issue of the State commenting on the credibility of its witnesses or its case, we agree with the Court of Appeals and Monday that the State crossed that line. It violates our jurisprudence for a prosecutor, a representative of the State, to comment on the credibility of the witnesses or the guilt and veracity of the accused.
¶ 19 [A]n attorney shall not
Assert his personal opinion as to the justness of a cause, as to the credibility of a witness, as to the culpability of a civil litigant, or as to the guilt or innocence of an accused; but he may argue, on his analysis of the evidence, for any position or conclusion with respect to the matters stated herein.
Applying the predecessor to this rule, this court has noted that it is just as reprehensible for one appearing as a public prosecutor to assert in argument his personal belief in the accused's guilt. State v. Case, 49 Wash.2d 66, 298 P.2d 500 (1956). Here, the prosecutor clearly violated CPR DR 7-106(C)(4) by asserting his personal opinion of the credibility of the witness and the guilt or innocence of the accused. First, he called the petitioner a liar no less than four times. Next, the prosecutor stated that the defense counsel did not have a case, and that the petitioner was clearly a "murder two". Finally, he implied that the defense witnesses should not be believed because they were from out of town and drove fancy cars.
These statements suggest not the dispassionate proceedings of an American jury trial, but the impassioned arguments of a character from Camus' "The Stranger".
State v. Reed, 102 Wash.2d 140, 145-46, 684 P.2d 699 (1984) (quoting former Code of Professional Responsibility DR 7-106(C)(4)).[3] *557 Plainly, the State violated these precepts. Monday has shown that the prosecutor's comments were improper.
¶ 20 Monday also contends, correctly, that the State committed improper conduct by injecting racial prejudice into the trial proceedings. The State repeatedly invoked an alleged African American, antisnitch code to discount the credibility of his own witnesses. First, we find no support or justification in the record to attribute this code to "black folk" only. Commentators suggest the "no snitching" movement is very broad. Prosecutor Konat intentionally and improperly imputed this antisnitch code to black persons only. Second, this functioned as an attempt to discount several witnesses' testimony on the basis of race alone. It is deeply troubling that an experienced prosecutor who, by his own account, had been a prosecutor for 18 years would resort to such tactics. "[T]heories and arguments based upon racial, ethnic and most other stereotypes are antithetical to and impermissible in a fair and impartial trial." State v. Dhaliwal, 150 Wash.2d 559, 583, 79 P.3d 432 (2003) (Chambers, J., concurring).
¶ 21 Neither was it an isolated appeal to racism. Not all appeals to racial prejudice are blatant. Perhaps more effective but just as insidious are subtle references. Like wolves in sheep's clothing, a careful word here and there can trigger racial bias. See generally Elizabeth L. Earle, Note, Banishing the Thirteenth Juror: An Approach to the Identification of Prosecutorial Racism, 92 Colum. L.Rev. 1212, 1222-23 & nn. 67, 71 (1992) (citing Joel Kovel, White Racism: A Psychohistory 32 (1984); Thomas F. Pettigrew, New Patterns of Racism: The Different Worlds of 1984 and 1964, 37 Rutgers L.Rev. 673 (1985); Reynolds Farley, Trends in Racial Inequalities: Have the Gains of the 1960s Disappeared in the 1970s?, 42 Am. Soc. Rev. 189, 206 (1977)); see also A. Leon Higginbotham, Jr., Racism in American and South African Courts: Similarities and Differences, 65 N.Y.U. L.Rev. 479, 545-51 (1990). Among other things, the prosecutor in this case, on direct examination of a witness, began referring to the "police" as "poleese." Monday contends, and we agree, that the only reason to use the word "poleese" was to subtly, and likely deliberately, call to the jury's attention that the witness was African American and to emphasize the prosecutor's contention that "black folk don't testify against black folk." VRP (May 30, 2007) at 29. This conduct was highly improper.
¶ 22 The State contends that even if the conduct was improper, Monday still bears the burden of showing a substantial likelihood that the misconduct affected the verdict, and, it contends, given the overwhelming evidence of Monday's guilt, this is a burden he has not met. It also notes that Monday's counsel did not object and that we have held that without a timely objection, reversal is not required "unless the conduct is `so flagrant and ill-intentioned that it causes an enduring and resulting prejudice that could not have been neutralized by a curative instruction to the jury.'" State v. Warren, 165 Wash.2d 17, 43, 195 P.3d 940 (2008) (quoting Brown, 132 Wash.2d at 561, 940 P.2d 546). We have also said that a defendant's failure to object to a prosecutor's remarks when they are made "strongly suggests" that the remark did not appear critically prejudicial in the trial's context. State v. Swan, 114 Wash.2d 613, 661, 790 P.2d 610 (1990). Similarly, objecting to improper conduct but failing to request a curative instruction does not warrant reversal if an instruction could have cured the prejudice. Warren, 165 Wash.2d at 26, 195 P.3d 940 (citing Yates, 161 Wash.2d at 774, 168 P.3d 359).
¶ 23 The notion that the State's representative in a criminal trial, the prosecutor, should seek to achieve a conviction by resorting to racist arguments is so fundamentally opposed to our founding principles, values, and fabric of our justice system that it should not need to be explained. The Bill of Rights sought to guarantee certain fundamental rights, including the right to a fair and impartial trial. The constitutional promise of an "impartial jury trial" commands jury indifference to race. If justice is not equal for all, it is not justice. The gravity of the violation of article I, section 22 and Sixth Amendment principles by a prosecutor's intentional *558 appeals to racial prejudices cannot be minimized or easily rationalized as harmless. Because appeals by a prosecutor to racial bias necessarily seek to single out one racial minority for different treatment, it fundamentally undermines the principle of equal justice and is so repugnant to the concept of an impartial trial its very existence demands that appellate courts set appropriate standards to deter such conduct. If our past efforts to address prosecutorial misconduct have proved insufficient to deter such conduct, then we must apply other tested and proven tests.
¶ 24 Such a test exists: constitutional harmless error. E.g., State v. Evans, 154 Wash.2d 438, 454, 114 P.3d 627 (2005) (citing State v. Brown, 147 Wash.2d 330, 340, 58 P.3d 889 (2002)); see also State v. Evans, 96 Wash.2d 1, 4, 633 P.2d 83 (1981). Under that standard, we will vacate a conviction unless it necessarily appears, beyond a reasonable doubt, that the misconduct did not affect the verdict. We hold that when a prosecutor flagrantly or apparently intentionally appeals to racial bias in a way that undermines the defendant's credibility or the presumption of innocence, we will vacate the conviction unless it appears beyond a reasonable doubt that the misconduct did not affect the jury's verdict. We also hold that in such cases, the burden is on the State.[4]
¶ 25 In this case, we cannot say beyond a reasonable doubt that the error did not contribute to the verdicts. The prosecutor's misconduct tainted nearly every lay witness's testimony. It planted the seed in the jury's mind that most of the witnesses were, at best, shading the truth to benefit the defendant. Under the circumstances, we cannot say that the misconduct did not affect the jury's verdict.[5]

CONCLUSION
¶ 26 It was improper for the prosecutor to cast doubt on the credibility of the witnesses based on their race. We cannot say beyond a reasonable doubt that the impropriety did not affect jury's work. We reverse.
WE CONCUR: CHARLES W. JOHNSON, GERRY L. ALEXANDER, SUSAN OWENS, Justices and RICHARD B. SANDERS, Justice Pro Tem.
MADSEN, C.J. (concurring).
¶ 27 A criminal conviction must not be allowed to stand when it is obtained in a trial permeated by racial bias deliberately introduced by the prosecution, as occurred here. Regardless of the evidence of this defendant's guilt, the injection of insidious discrimination into this case is so repugnant to the *559 core principles of integrity and justness upon which a fundamentally fair criminal justice system must rest that only a new trial will remove its taint.
¶ 28 I cannot agree with the majority's illusory harmless error analysis in this case. As the dissent points out, there is abundant evidence of the defendant's culpability.[1] Rather than engage in an unconvincing attempt to show the error here was not harmless, the court should hold instead that the prosecutor's injection of racial discrimination into this case cannot be countenanced at all, not even to the extent of contemplating to any degree that error might be harmless.
¶ 29 There are many cases where racism, injected into a trial in various ways, has required reversal. E.g., Hamilton v. Alabama, 376 U.S. 650, 84 S.Ct. 982, 11 L.Ed.2d 979 (1964) (summary, per curiam decision reversing a judgment of contempt where it was based on discrimination by the prosecutor in addressing an African American witness only by her first name); Johnson v. Virginia, 373 U.S. 61, 62, 83 S.Ct. 1053, 10 L.Ed.2d 195 (1963) (arrest and conviction based on refusal of African American to comply with segregated seating arrangements imposed in the courtroom; the Court reversed on the ground that "State-compelled segregation in a court of justice is a manifest violation of the State's duty to deny no one the equal protection of its laws"). Such cases involve the "point where the due process and equal protection clauses overlap or at least meet." United States ex rel. Haynes v. McKendrick, 481 F.2d 152, 159 (2d Cir.1973). Injection of such discrimination is "antithetical to the purposes of the fourteenth amendment ... whether in a procedure underlying, the atmosphere surrounding, or the actual conduct of, a trial." Id.
¶ 30 In Weddington v. State, 545 A.2d 607, 610 (Del.1988), the defendant was tried for murder and assault. During the prosecutor's examination of the defendant, an African American, he asked the defendant about convincing two other men to go to Indiana with him because there were "`some loose white women up there.'" (Emphasis omitted.) On appeal, the State agreed that the question was improper and, together with the defense, asked the court to find it was not harmless error. The court declined to engage in a harmless error analysis. Instead, the court concluded that "[s]uch a question violates the fundamental fairness which is essential to the very concept of justice" and "[a] question which improperly injects race as an issue before the jury poses a serious threat to a fair trial." Id. at 613. The court held that reversal was required because "the right to a fair trial that is free of improper racial implications is so basic to the federal Constitution that an infringement upon that right can never be treated as harmless error." Id. at 613, 614-15 (emphasis added).
¶ 31 In United States v. Cabrera, 222 F.3d 590 (9th Cir.2000), the court determined that the evidence was sufficient to convict the defendants and noted that the defendants had not objected to a police detective's references on the witness stand to their Cuban origin and negative generalizations about the Cuban community (improper statements about the police "working Cubans," the way Cubans package drugs in wafers, and resident aliens posing a flight risk). The court nevertheless concluded the improper references to Cubans constituted reversible error, stating that "[t]he fairness and integrity of criminal trials are at stake if we allow police officers to make generalizations about racial and ethnic groups in order to obtain convictions. People cannot be tried on the basis of their ethnic backgrounds or national origin." Id. at 597. The court did not engage in a harmless error analysis.
¶ 32 Other courts have also noted the serious nature of injecting racial considerations into a case. "To raise the issue of race is to draw the jury's attention to a characteristic that the Constitution generally commands us to ignore. Even a reference that is not derogatory may carry impermissible connotations, or may trigger prejudiced responses in the listeners that the speaker might neither have predicted nor intended." McFarland v. *560 Smith, 611 F.2d 414, 417 (2d Cir.1979). "In cases where race should be irrelevant, racial considerations, in particular, can affect a juror's impartiality and must be removed from courtroom proceedings to the fullest extent possible." State v. Varner, 643 N.W.2d 298, 304 (Minn.2002).
¶ 33 In State v. Cabrera, 700 N.W.2d 469 (Minn.2005), the prosecutor argued during closing argument that the defendant's counsel engaged in racist speculation by referring to gang associations of the State's witnesses, stating that "`the defense case in addition to thein addition to just throwing mud on young black men and saying that they'reif they're young black men they must be in gangs'" Id. at 474. After defense counsel's objection was overruled, the prosecutor returned to the subject and said that "`[y]ou heard nothing about gangs other than what came from the State's witnesses telling about their past association and some wild and, I submit, racist speculation on the part of counsel here.... Members of the Jury, this is not about race.'" Id.
¶ 34 The court noted that the defendant's theory of the case included the idea that, given the witness's admissions during testimony about past gang membership, gang rivalry might have played a role in the shooting at issue, which the defense claimed was carried out by another person. The court stated that "within the context of the record before us, the prosecutor's allegation that defense counsel was engaging in `racist speculation' was incorrect and undermined the prosecutor's obligation to ensure that the defendant received a fair trial" and constituted "serious prosecutorial misconduct." Id. at 475.
¶ 35 The court said that given the strength of the evidence, "it would be difficult for us not to conclude that the prosecutor's comments were harmless beyond a reasonable doubt." Id. Nevertheless, the court reversed the conviction because improper injection of race can still affect the jurors' partiality and must be removed. Id. (citing Varner, 643 N.W.2d at 304-05). The court stated, "Affirming this conviction would undermine our strong commitment to rooting out bias, no matter how subtle, indirect, or veiled." Id.
¶ 36 In the present case, too, the prosecutor's corruption of the trial cannot be tolerated. The prosecutor's blatant racist attacks impugned the standing and credibility of the State's witnesses, who were African American, and explicitly informed the jury that because these witnesses were black they lied on the stand because all black people have a "code" under which they refuse to tell the truth to police and refuse to testify truthfully. Further, it cannot be ignored that the defendant himself is African American and was presumably subject to the same charge in view of the prosecution's questioning. The appeals to racial bias in this case were not isolated incidents but instead pervaded the prosecution of this case.
¶ 37 Regardless of the evidence against this defendant, a criminal conviction must not be permitted to stand on such a foundation. The appeals to racism here by an officer of the court are so repugnant to the fairness, integrity, and justness of the criminal justice system that reversal is required. Accordingly, though I cannot agree with the majority's harmless error analysis, I would reverse the defendant's convictions because the integrity of our justice system demands it.
WE CONCUR: MARY E. FAIRHURST and DEBRA L. STEPHENS, Justices.
J.M. JOHNSON, J. (dissenting).
¶ 38 Clear videotape evidence shows Kevin L. Monday Jr. firing numerous shots to strike and kill Francisco Green (a victim who lies dead at the end of the video and is forgotten by the majority today). The jury, which has the sole responsibility to decide guilt and innocence in our justice system, saw the videotape. The video is also available on line to compare the jury's finding of guilt with the reasoning of the majority.[1]
¶ 39 The majority reverses Monday's convictions of murder in the first degree and two counts of assault in the first degree, even *561 though the jury properly (and correctly) considered all the evidence and found Monday guilty of these crimes beyond a reasonable doubt. The jurors, moreover, were reminded that they served as officers of the court and had the duty to act impartially, without prejudice. I trust that this jury faithfully applied the law provided by the court's instructions to the evidence presented at trial.
¶ 40 By reversing these convictions, the majority not only sets aside controlling legal precedent, it delays or denies justice for the victim, disregarding the constitutional rights of Francisco Green and his family as victims under article I, section 35 of the Washington State Constitution. It is possible to deter any problematic trial conduct without denying justice for Francisco Green and his family. If justice is not equal for all, it is not justice. Cf. majority at 557-58. I dissent.

OVERWHELMING EVIDENCE

1. The Assault Convictions

¶ 41 The evidence supporting Monday's assault convictions is overwhelming. The entire confrontation between Monday and Francisco Green was captured on videotape, which is approximately three minutes in length. The videotape shows Monday raising and aiming his gun directly at Green after 2 minutes and 36 seconds of verbal provocations and escalating scuffles between Monday and Green. The videotape then shows that Monday, after a pause of 3 seconds, shot at Green and kept shooting at him  a total of 11 times as Green ran away. Monday's bullets struck Green in the left upper back, the lower middle back, the left side of the chest, and the back of the left forearm. Green's left lung was perforated by the shot to the upper back, and his small intestine was perforated five times by the shot to the lower back. Death ensued from the multiple gunshot wounds. The elements of assault[2] were clearly proved beyond a reasonable doubt in this case.

2. The First Degree Murder Conviction

¶ 42 This same videotape evidence supports Monday's murder conviction, including the element of premeditation. Monday shot Green in the back, chest, and arm with 4 out of 11 shots fired from a .40 caliber firearm, as Green ran away, after at least 2 minutes and 39 seconds of confrontation and escalated fighting captured on videotape.[3]
*562 ¶ 43 Indeed, the jury found that the totality of the evidence presented at trial supported Monday's murder conviction beyond a reasonable doubt.[4] Although the majority does not think that the videotape alone is dispositive of Monday's murder conviction, it does not follow that the court should substitute its judgment for that of the jury, which properly (and correctly) considered all the evidence presented at trial.

EXHIBIT 132  VIDEOTAPE EVIDENCE[5]
¶ 44 Monday's convictions should be affirmed regardless of the test the majority employs to achieve its result. The videotape alone provides sufficient evidence for the jury to convict Monday of assault in the first degree and first degree murder and was shown in its entirety to the jury multiple times throughout the trial. As the court stated in its ruling, to give the jury the option to watch the videotape in the deliberation room, "[T]he jury has seen this thing stop and go multiple times in this case. ... [I]t was stopped and started and dissected all the way through the trial. ... I don't see any harm [in giving the jury the option to watch the videotape in the deliberation room]." Verbatim Report of Proceedings (VRP) (May 30, 2007) at 20.
¶ 45 At the beginning of the videotape, Monday is seen lifting up his red shirt in a threatening and provocative manner. Ex. 132 (0:00-0:10). Monday is also heard verbally addressing an individual, likely the victim, while shouting "West Side G. ..." Id. Monday leaves the camera view about 10 seconds into the videotape, and before he reenters the scene, his yelling is heard off-screen as the confrontation continues. Id. (0:10-1:33). Monday reenters the scene 1 minute and 33 seconds into the videotape. Id. (1:33). At 1 minute and 53 seconds to 1 minute and 55 seconds, Monday is seen cornering an individual wearing a dark shirt, likely the victim, in an entryway and grabbing him. Id. (1:53-1:55). The fight quickly escalates. Monday and the individual are seen physically engaged with one another, and Monday pulls the victim out of the entryway. Id. (1:55-2:06). Monday pulls at the victim's arms, yells, and repeats the phrase "one on one," clearly demanding a fight. Id. The two are briefly separated by observers but are next seen circling each other, as Monday continues to shout and demand "one on one." Id. (2:06-2:36). The jury could have considered these events as probative to the issue of premeditation. Monday draws the gun, and the shooting begins soon thereafter. Id. (2:36-2:43).
¶ 46 If this were not enough, the last portion of the videotape shows Monday shooting Green numerous times  a total of 11 shots. Id. (1:53-2:44). This easily satisfies the State's burden of proof. Monday pulled a gun and started walking toward Green with the gun aimed in Green's direction. Id. (2:36). This took several seconds before he started firing. Id. (2:36-2:39). Standing still, Monday fired 5 shots at Green, then 6 more as he walked slowly backward. Id. (2:39-2:43). After firing all 11 shots, Monday turned and ran away. Id. (2:44). Evidence established that Green was hit in his back, chest, and arm. The total length of the fight, as caught by the videotape, is approximately 2 minutes and 43 seconds, measured from the start of the videotape to the last of the 11 shots fired by Monday.
¶ 47 This evidence was sufficient to remove any reasonable doubt that Monday deliberately killed Green. The videotape shows no erratic behavior by Monday during the shooting. Monday appears calm and composed. Premeditation under RCW 9A.32.030(1)(a) does not require an exhaustive analysis of a defendant's alternative course of conduct. Premeditation only requires considering and deciding on a course of conduct. This Monday did, as conclusively shown by the jury's careful review of the videotape evidence. As the jury concluded, *563 the State not only satisfied its burden to prove premeditation beyond a reasonable doubt, it proved each element of the crimes as charged.

ALLEGED PROSECUTORIAL MISCONDUCT AND HARMLESS ERROR
¶ 48 I agree that the prosecutor made several problematic expressions over the course of a month-long trial. I do not agree, however, that reversal of Monday's convictions is the appropriate remedy. The convictions should be affirmed based on the jury's proper application of the law to the evidence, not reversed in the name of deterrence. It is possible to deter any improper trial conduct without delaying or denying justice for Francisco Green and his family and disregarding their constitutional rights under article I, section 35.
¶ 49 Unfortunately, the majority misconstrues what the prosecutor said and does not consider the context of the statements, as our case law requires.[6] This is what prosecutor said:
[T]he only thing that can explain ... why witness after witness ... is called to this stand and flat out denies what cannot be denied on that video is the code. And the code is black folk don't testify against black folk. You don't snitch to police.
VRP (May 30, 2007) at 29. The prosecutor's reference was made in the context of a month-long trial in which several witnesses recanted earlier statements made to police and expressed reluctance to testify. Indeed, the trial court noted, "[V]irtually every lay witness has been very reticent to testify in this case, and the memory of virtually every lay witness has had significant holes in places where one would not expect. ..." VRP (May 23, 2007) at 98. Although the statement "black folk don't testify against black folk" without this background is problematic, the prosecutor's broader statement about snitching to the police and the "code" describes a too common occurrence: the unwillingness of individuals (no matter their age or race) to identify by name others who may be involved in crime.[7] The prosecutor's general reference to a "code" was a persuasive point in closing argument before this jury and not misconduct warranting reversal. Even Monday's defense counsel referenced an "unwritten code" and its potential effect on witness testimony.[8]
¶ 50 Second, although the transcript has the prosecutor saying "police" for part of Ms. Sykes' direct examination, the transcript has both him and Ms. Sykes saying "po-leese." VRP (May 21, 2007) at 146-209; VRP (May 22, 2007) at 2-55. The transcript has the prosecutor saying "po-leese" after the prosecutor had difficulty interacting with Ms. Sykes throughout her direct examination, and the prosecutor said "we'll use your term then" once before in an unfortunate effort to elicit Ms. Sykes' testimony. See VRP (May 22, 2007) at 14 (using the word "arguing" *564 instead of "confrontation" in describing the surrounding events).
¶ 51 I would agree that the prosecutor's intonation of the word "police"  transcribed as "po-leese" at certain places in the record  was inappropriate and unprofessional. VRP (May 21, 2007) at 146-209; VRP (May 22, 2007) at 2-55. But this does not mean the prosecutor employed racially derogatory language de facto by saying "po-leese" while questioning Adonij ah Sykes, or more importantly, that the jury was unable to discount it. We surely cannot conclude that the prosecutor was employing racially derogatory language de facto based on the text of the transcript alone, and the references surely do not justify reversing this jury's murder and assault convictions.
¶ 52 We should hold as the trial court did in its response to the prosecutor's tone: "[L]et the jury decide. ... I'm sure they have the ability to do that." VRP (May 22, 2007) at 20. A reasonable jury found Monday guilty beyond a reasonable doubt of murder in the first degree and two counts of assault in the first degree. The trial court could not have overturned the jury's verdict under our civil rules.[9] Neither should this court, given that the jury alone decides guilt and innocence in our criminal justice system. Overturning this jury verdict despite overwhelming evidence is "so fundamentally opposed to our founding principles, values, and fabric of our justice system that it should not need to be explained." Majority at 557.
¶ 53 Third, and perhaps most vexing, the majority fails to honestly apply the holding of tried, tested, and controlling precedent. Appellate courts do not assess "`[t]he prejudicial effect of a prosecutor's improper comments... by looking at the comments in isolation but by placing the remarks `"in the context of the total argument, the issues in the case, the evidence addressed in the argument, and the instructions given to the jury."'" State v. Yates, 161 Wash.2d 714, 774, 168 P.3d 359 (2007) (emphasis added) (alteration in original) (quoting State v. Brown, 132 Wash.2d 529, 561, 940 P.2d 546 (1997)). The majority disregards the context of the total argument. The majority does not look to the issues in the case. The majority does not look to the evidence or to the instructions given to the jury. The majority looks to several comments in isolation.
¶ 54 In contrast, I would look to the context of the argument and the context of a month-long trial in which several witnesses recanted earlier statements made to police and were reluctant to testify. Most importantly, the prosecutor repeatedly referred to the overwhelming videotape evidence throughout his argument.[10] Finally, I would look to the instructions given to the jury and find that this jury's verdict was fair, unbiased, and impartial.[11]
¶ 55 This court has employed a specific test for prosecutorial misconduct for at least 40 years: we examine the allegedly improper conduct in the full context of the trial. The conviction will be reversed only if (1) the conduct was improper and (2) there is a substantial likelihood that the misconduct affected *565 the jury's verdict. State v. McKenzie, 157 Wash.2d 44, 52, 134 P.3d 221 (2006). The defendant carries this burden. State v. Fisher, 165 Wash.2d 727, 747, 202 P.3d 937 (2009). This is the constitutional test for preserving a defendant's right to trial by an impartial jury, as enshrined in the Sixth Amendment to the United States Constitution and article I, section 22 of the Washington State Constitution. See id. at 746-47, 202 P.3d 937. We never meddle with such established constitutional protections, unless a compelling showing is made that the current test has failed and is causing harm.
¶ 56 The majority's refusal to thoroughly engage in the second prong of our constitutional analysis is tacit acknowledgment that the defendant was not prejudiced. The corollary of this conclusion is that the jury's verdict was sound.

CONCLUSION
¶ 57 The videotape of Monday repeatedly shooting Mr. Green was shown to the jury and proved beyond a reasonable doubt that Monday deliberately took Green's life. There was abundant other evidence. Even if the prosecutor's comments arguably tainted the jury's impressions of some witnesses, this could not affect the jury's perception of the videotape and other evidence.
¶ 58 This jury properly (and correctly) performed its duty and found Monday guilty beyond a reasonable doubt. The defendant received the fair trial that is constitutionally guaranteed. The majority fails to accord murder victim Francisco Green the dignity and respect he deserves under our constitution. Sadly, the victim's family is sentenced to relive his murder at another trial. I respectfully dissent.
NOTES
[1] The court reporter transcribed Konat's use of the word "police" as "po-leese." A different court reporter transcribed the first day of Sykes's testimony and consistently transcribed the word as "police."
[2] Over a 100 years old, Fielding's words bear repeating again:

[A] public prosecutor ... is a quasi-judicial officer, representing the people of the state, and presumed to act impartially in the interest only of justice. If he lays aside the impartiality that should characterize his official action, to become a heated partisan, and by vituperation of the prisoner and appeals to prejudice seeks to procure a conviction at all hazards, he ceases to properly represent the public interest, which demands no victim, and asks no conviction through the aid of passion, sympathy or resentment.
Fielding, 158 N.Y. at 547, 53 N.E. 497, quoted with approval in Case, 49 Wash.2d at 70-71, 298 P.2d 500.
[3] Since Reed, the Code of Professional Responsibility has been replaced by the Rules of Professional Conduct. DR 7-106(C)(4) is substantially similar to the current RPC 3.4(e), which states that a lawyer shall not

in trial ... assert personal knowledge of facts in issue except when testifying as a witness, or state a personal opinion as to the justness of a cause, the credibility of a witness, the culpability of a civil litigant or the guilt or innocence of an accused.
[4] The dissent is of the view that the videotape is overwhelming evidence of guilt. We respectfully disagree that the video alone is dispositive. While the videotape clearly establishes that Monday was the shooter, it does not by itself establish premeditation, nor does it rule out some defenses. The State certainly did not think the video was enough; otherwise, this trial would not have stretched on for weeks. More importantly, our task today is not to determine whether there was sufficient evidence to sustain the jury's verdict. Our task today is to determine whether Monday is entitled to relief because the prosecutor made improper, racially charged comments.

Given our holding, we do not reach whether the firearms enhancement was properly imposed.
[5] The dissent contends that we have disregarded the rights of the victim and his family under article I, section 35 of our state constitution. When the government resorts to appeals to racial bias to achieve its ends, all of society suffers including victims. Further, we fail to see how article I, section 35 is implicated in our opinion today. Article I, section 35 provides:

Effective law enforcement depends on cooperation from victims of crime. To ensure victims a meaningful role in the criminal justice system and to accord them due dignity and respect, victims of crime are hereby granted the following basic and fundamental rights.
Upon notifying the prosecuting attorney, a victim of a crime charged as a felony shall have the right to be informed of and, subject to the discretion of the individual presiding over the trial or court proceedings, attend trial and all other court proceedings the defendant has the right to attend, and to make a statement at sentencing and at any proceeding where the defendant's release is considered, subject to the same rules of procedure which govern the defendant's rights. In the event the victim is deceased, incompetent, a minor, or otherwise unavailable, the prosecuting attorney may identify a representative to appear to exercise the victim's rights. This provision shall not constitute a basis for error in favor of a defendant in a criminal proceeding nor a basis for providing a victim or the victim's representative with court appointed counsel.
[1] The majority suggests that the length of the trial indicates that the evidence cannot be overwhelming, majority at 558 n.4, but, as the dissent points out, the defendant confessed and there was a videotape of the entire event.
[1] I am happy to allow the videotape to speak for itself: http://www.courts.wa.gov/newsinfo/content/video/827362EvidenceVideo.htm. Cf. Scott v. Harris, 550 U.S. 372, 379 n. 5, 127 S.Ct. 1769, 167 L.Ed.2d 686 (2007) (Scalia, J., majority opinion).
[2] A person is guilty of assault in the first degree if he or she, with the intent to inflict great bodily harm, assaults another with a firearm or any deadly weapon or by any force or means likely to produce great bodily harm or death. RCW 9A.36.011.
[3] To prove the element of premeditation, the State must show only that the defendant decided to cause the victim's death after deliberating or reflecting for some period. State v. Gregory, 158 Wash.2d 759, 817, 147 P.3d 1201 (2006). As we recently affirmed in Gregory, premeditation is the "`deliberate formation of and reflection upon the intent to take a human life [that] involves the mental process of thinking beforehand, deliberation, reflection, weighing or reasoning for a period of time, however short.'" Id. at 817, 147 P.3d 1201 (emphasis added) (alteration in original) (quoting State v. Hoffman, 116 Wash.2d 51, 82-83, 804 P.2d 577 (1991)); State v. Ollens, 107 Wash.2d 848, 850, 733 P.2d 984 (1987) (quoting State v. Brooks, 97 Wash.2d 873, 876, 651 P.2d 217 (1982)). There is no fixed or definite length of time between the formation of the intention to kill and the killing necessary to establish premeditation. State v. Duncan, 101 Wash. 542, 544, 172 P. 915 (1918). This time may be very brief, even "but a moment." Id. The period of time at issue here was, therefore, easily sufficient for the jury to find that Monday deliberately shot and killed Green in light of all evidence and testimony presented in this case. For more cases supporting the jury's finding of premeditation in this case, see State v. Ortiz, 119 Wash.2d 294, 311-12, 831 P.2d 1060 (1992) (finding premeditation where multiple wounds were inflicted by a knife and the victim was struck in the face after a prolonged struggle); Ollens, 107 Wash.2d at 853, 733 P.2d 984 (holding that multiple wounds alone were probative to the inference of premeditation where a weapon was used, the victim was struck from behind and there was evidence of a motive); State v. Gentry, 125 Wash.2d 570, 599, 888 P.2d 1105 (1995) (citing Ollens and Ortiz and detailing other cases in which the evidence was sufficient to establish premeditation); State v. Rehak, 67 Wash.App. 157, 164, 834 P.2d 651 (1992) (premeditation existed where victim was shot three times in the head, two after he had fallen to the floor); State v. Commodore, 38 Wash.App. 244, 248, 684 P.2d 1364 (1984) (premeditation implied where defendant lingered by the door, proceeded to a room where he knew he would find a gun, and returned to shoot the victim); State v. Sargent, 40 Wash.App. 340, 698 P.2d 598 (1985) (inference of premeditation supported by evidence that victim was struck by two blows to the head, with some interval passing between the blows, while she was lying face down).
[4] A person is guilty of murder in the first degree when, "[w]ith a premeditated intent to cause the death of another person, he or she causes the death of such person or of a third person. ..." RCW 9A.32.030(1)(a).
[5] Exhibit 132 was pretrial Exhibit 6. Clerk's Papers (CP) at 278.
[6] E.g., State v. McKenzie, 157 Wash.2d 44, 52, 134 P.3d 221 (2006); accord State v. Yates, 161 Wash.2d 714, 774, 168 P.3d 359 (2007) (we do not assess "`[t]he prejudicial effect of a prosecutor's improper comments ... by looking at the comments in isolation but by placing the remarks "in the context of the total argument, the issues in the case, the evidence addressed in the argument, and the instructions given to the jury."'" (emphasis added) (alteration in original) (quoting State v. Brown, 132 Wash.2d 529, 561, 940 P.2d 546 (1997))).
[7] See, e.g., Andrea L. Dennis, Collateral Damage? Juvenile Snitches in America's "Wars" on Drugs, Crime, and Gangs, 46 Am.Crim. L.Rev. 1145, 1147 (2009) (noting that even children who were only suspected of "snitching" have been killed by gang members); Kari Larsen, Deliberately Indifferent: Government Response to HIV in U.S. Prisons, 24 J. Contemp. Health L. & Pol'y 251, 257 (2008) ("An inmate `who snitches or rats ... violates a strict prison code, subjecting them to severe and violent retribution by the entire inmate community.'" (alteration in original)).
[8] See e.g., VRP (May 30, 2007) at 77-78 ("The State says that Antonio Kidd ... won't identify [himself] because of the code. [Mr. Kidd was] [w]illing to put himself at personal risk, but, in terms of intervening in this fight, but [sic] there is this unwritten code that he is going to abide by."); id. at 78 ("The State would have you believe that the only reason [Nakita Banks] did not identify Kevin Monday as the shooter was because of this code ... [and] decided that this code is more important than her oath to tell the truth."); id. at 78-79 ("[A]gain, this code of silence is something that [DiVaughn Jones] considers more important than looking out for Francisco Green."). Id. at 79.
[9] "If, during a trial by jury, a party has been fully heard with respect to an issue and there is no legally sufficient evidentiary basis for a reasonable jury to find or have found for that party with respect to that issue, the court may grant a motion for judgment as a matter of law against the party on any claim. ..." CR 50(a)(1)
[10] E.g., VRP (May 30, 2007) at 32 ("Recall, if you will, the video.").
[11] In Instruction 1, the court reminded the jury of its solemn duty to render an impartial verdict:

It is your duty to decide the facts in this case based upon the evidence presented to you during this trial. ... You must apply the law from my instructions to the facts that you decided have been proved, and in this way decided the case ... you are the sole judges of the credibility of each witness. ... As jurors, you are officers of this court. You must not let your emotions overcome your rational thought process. You must reach your decision based on the facts proved to you and on the law given to you, not on sympathy, prejudice, or personal preference. To ensure that all parties receive a fair trial, you must act impartially with an earnest desire to reach a proper verdict.
CP at 171-73 (emphasis added).
In Instruction 2, the court reiterated, "each of you must decide the case for yourself, but only after you consider the evidence impartially with your fellow jurors." CP at 174. This was done before the court instructed the jury as to the elements of each crime, the presumption of evidence, and so forth. CP at 175-221.