IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | No. 36530-1-III |
| | ) | |
| Respondent, | ) | |
| | ) | |
| v. | ) | UNPUBLISHED OPINION |
| | ) | |
| TYLER TERELL BAGBY, | ) | |
| | ) | |
| Appellant. | ) | |

LAWRENCE-BERREY, J. — Tyler Bagby appeals his convictions for residential burglary, harassment, and fourth degree assault. We reject his arguments of prosecutorial misconduct (implicit racial bias) and instructional error and affirm.

FACTS

Tyler Bagby, a Black American student at Washington State University, went to a fraternity party with three friends, Solomon Cooper, Shyla Roberson, and Kailah Crisostomo. Ms. Crisostomo had been dating Mr. Bagby for a couple of weeks and attended nearby University of Idaho. The group had shots of vodka before the party and they continued to drink at the fraternity.

At one point, Ms. Crisostomo separated from Mr. Bagby and went into the fraternity's coed bathroom. When Ms. Crisostomo did not return, Mr. Bagby asked Ms.

Roberson to see if his girlfriend was alright. Ms. Roberson found Ms. Crisostomo in the bathroom crying, saying she did not want to go home with Mr. Bagby.

At some point, Mr. Bagby entered the bathroom and asked what was going on. Ms. Roberson told him that she could take Ms. Crisostomo home. Mr. Bagby argued with her and insisted that he take Ms. Crisostomo home. He began hitting the stall door and continued to demand that Ms. Crisostomo come with him.

Three other people at the fraternity party watched this unfold—Austin Davis, Sabrina Manzo, and Leann Griffith. None of those three people knew Mr. Bagby or either of the two women.

Mr. Davis, a white man, attempted to intervene and get Mr. Bagby to leave the bathroom. Mr. Bagby responded by punching Mr. Davis, causing him to lose consciousness and fall to the ground. Mr. Bagby continued punching Mr. Davis. Mr. Bagby was restrained and removed from the fraternity by his friend, Mr. Cooper. Ms. Roberson was able to leave the party with Ms. Crisostomo and the two went to Ms. Roberson's apartment.

Over the next 40 minutes, Mr. Bagby repeatedly called and texted Ms. Roberson, sending her insulting and threatening messages. Approximately 10 minutes later, Mr. Bagby arrived at Ms. Roberson's apartment and began loudly banging on her door. He

2

forced the door open and made his way into the apartment where he began yelling at Ms. Crisostomo. Ms. Roberson called 911 and Ms. Crisostomo locked herself in a bedroom.

Daniel Robinett and Elizabeth Nelson heard the yelling and tried to assist the two women. Mr. Robinett and Ms. Nelson did not know each other nor did they know Mr. Bagby or the two women. Mr. Robinett and Ms. Nelson intervened and tried to get Mr. Bagby to leave. About this time, officers from the Pullman Police Department arrived and escorted Mr. Bagby away.

The State charged Mr. Bagby with one count of residential burglary, one count of third degree malicious mischief, one count of harassment, and one count of fourth degree assault.

Prior to trial, both parties submitted their proposed jury instructions. The instructions proposed by Mr. Bagby included the standard voluntary intoxication instruction. The State's proposed instructions did not include a voluntary intoxication instruction.

At trial, the State called multiple witnesses. Many did not know Mr. Bagby or Mr. Davis. The prosecutor and defense counsel often asked these witnesses questions about what they saw and at times referred to either the nationality, race, or ethnicity of the person they were describing:

3

[STATE]: . . . And the gentleman talking to the women in the stall trying to get his girlfriend out, what was his nationality?
[WITNESS]: He was African American.

Report of Proceedings (RP) at 79.

[STATE]: . . . Now the record reflects she identified the defendant, and then the gentleman that came up to talk to him, what was his nationality?
[WITNESS]: He looked white.

RP at 80.

[STATE]: . . . Did you ever pay attention to his nationality or anything else?
[WITNESS]: No.
[STATE]: Ethnicity, sorry.
[WITNESS]: He was black, I think.

RP at 94.

[STATE]: Okay. White, black, Latino?
[WITNESS]: White.

RP at 34.

[DEFENSE COUNSEL]: . . . Were they African American, or were they white?
[WITNESS]: I believe they were African American.

RP at 71.

[DEFENSE COUNSEL]: Were there any other black people in the bathroom?
[WITNESS]: I do not know that.

RP at 73.

> [STATE]: . . . All right, so, then you see these, then did you see the white guy talk with the black—with the defendant here?
> [WITNESS]: Hmm hmmm. [Indicating yes.]

RP at 80.

> [STATE]: . . . What was the demeanor like of the white guy at this time?
> [WITNESS]: He was pretty calm, very casual, was kind of like hey bro, like you just need to leave. . . .

RP at 80-81.

> [STATE]: . . . And the defendant punched the white guy that was talking to him?
> [WITNESS]: Yes.

RP at 81.

> [DEFENSE COUNSEL]: . . . Do you recall, you said you indicated that Mr. Bagby was there, okay, do you recall any other black guys in the bathroom at that time?
> [WITNESS]: At the time, no.

RP at 86.

> [DEFENSE COUNSEL]: . . . He was the only black guy in the bathroom?
> [WITNESS]: That I remember, yeah.

RP at 88.

> [STATE]: Did you recognize the ethnicity of that guy?
> [WITNESS]: He was white.

5

RP at 95.

> [STATE]:  Is that the person that was talking to the African American man?
> [WITNESS]:  Yes.

RP at 96.

> [STATE]:  And again, we're talking, the white guy did not push touch [or] hit the black guy he was talking to?
> [WITNESS]:  Yes.

RP at 97.

> [STATE]:  . . . What ethnicity was he?
> [WITNESS]:  White.

RP at 180.

Neither party objected to the other referring to nationality, race or ethnicity when asking questions.

The State began its cross-examination of Mr. Bagby by focusing on his friendship with Ms. Roberson.  Mr. Bagby admitted that he and Ms. Roberson had been to each other's apartments.  This led to a few questions about Mr. Bagby's dog:

> [THE STATE]:  She'd watch your dog for you while you went to the store?
> [MR. BAGBY]:  Yes.
> [THE STATE]:  How long have you had that dog?
> [MR. BAGBY]:  I got my dog in August of 2017, so that makes him about a year and a half now, his birthday is June 11th.

[THE STATE]:  So, he would have been a puppy when she knew him?

[Mr. BAGBY]:  Yes.

[THE STATE]:  For six months?

[MR. BAGBY]:  That's [why] she watched him.

[THE STATE]:  Okay. All right.  Still have your dog?

MR. BAGBY:  Yes, I do.

[THE STATE]:  Love him?

[MR. BAGBY]:  Of course.

[THE STATE]:  Care about him deeply?

[MR. BAGBY]:  Who has a dog for over a year and don't care about him?  Yes, I do.

[THE STATE]:  Unfortunately, some people [don't]; but I'm glad to hear you're not one of them, so okay. . . .

RP at 261-62.  Defense counsel did not object to these questions.

After both sides presented their cases, the trial court instructed the jury on the law. The instructions included the standard voluntary intoxication instruction submitted earlier by defense counsel.

The jury found Mr. Bagby guilty of all charges except malicious mischief. The trial court imposed a standard range sentence.  Mr. Bagby timely appealed.

## ANALYSIS

### PROSECUTORIAL MISCONDUCT

Mr. Bagby contends the prosecutor committed misconduct by use of racial descriptions and stereotypes in his questioning.  We disagree.

7

"Prosecutorial misconduct is grounds for reversal if 'the prosecuting attorney's conduct was both improper and prejudicial.'" *State v. Monday*, 171 Wn.2d 667, 675, 257 P.3d 551 (2011) (quoting *State v. Fisher*, 165 Wn.2d 727, 747, 202 P.3d 937 (2009)). Generally, where a prosecutor's conduct is unobjected to, a defendant waives the right to argue prosecutorial misconduct unless the conduct was so flagrant and ill intentioned that a curative instruction would not have alleviated the prejudice. *Fisher*, 165 Wn.2d at 747. Here, Mr. Bagby did not object to the prosecutor's questions that repeatedly referred to his and Mr. Davis's national origin, race, and ethnicity nor did Mr. Bagby object to the prosecutor's questions about his dog.

Mr. Bagby argues that his prosecutorial misconduct claims are not waived because the prosecutor's repetitive references reflect implicit bias that tainted his trial. We first review the roles of a prosecutor and why convictions tainted by a prosecutor's racist arguments or stereotypes are so repugnant to our system of justice.

A prosecutor serves two important functions—enforcing the law by prosecuting law breakers and representing the state in the search for justice. *Monday*, 171 Wn.2d at 676.

> Defendants are among the people the prosecutor represents. The prosecutor owes a duty to defendants to see that their rights to a constitutionally fair trial are not violated. Thus, a prosecutor must function within boundaries while zealously seeking justice. A prosecutor gravely

> violates a defendant's Washington State Constitution article I, section 22
> right to an impartial jury when the prosecutor resorts to racist argument and
> appeals to racial stereotypes or racial bias to achieve convictions.

*Id.* (citations omitted).

In *Monday*, the defendant was on trial for murder and assault. *Id.* at 669. At trial, the defense called a number of witnesses, some of whom were Black. *Id.* at 676. During closing, the prosecutor argued: "'[T]he only thing that can explain to you the reasons why witness after witness after witness is called to this stand and flat out denies what cannot be denied on that video is the code. And the code is black folk don't testify against black folk.'" *Id.* at 674 (alteration in original). The jury returned guilty verdicts.

On appeal, the State conceded that the prosecutor's remarks were misconduct but argued the defendant waived his prosecutorial misconduct claim because he failed to object. *Id.* at 677. The Supreme Court disagreed. It determined that the prosecutor's racist remarks violated the defendant's constitutional right to an impartial jury and reviewed the defendant's prosecutorial misconduct claim by applying the constitutional harmless error standard of review. *Id.* at 680. The court held: "[W]hen a prosecutor flagrantly or apparently intentionally appeals to racial bias in a way that undermines the defendant's credibility or the presumption of innocence, we will vacate the conviction unless it appears beyond a reasonable doubt that the misconduct did not affect the jury's

9

verdict." *Id.* The court determined that the prosecutor's misconduct was not harmless beyond a reasonable doubt and reversed the defendant's convictions. *Id.* at 681.

Applying the rule in *Monday*, we first look to whether the prosecutor appealed to racial bias. Mr. Bagby first claims the prosecutor appealed to racial bias by repeatedly referring to race, ethnicity, skin color, and national origin when asking witnesses questions. Here, both the prosecutor and defense counsel referred to race, ethnicity, and skin color when questioning witnesses. This allowed the witnesses, who did not know Mr. Bagby or Mr. Davis, to distinguish them when testifying.

At various other times, the prosecutor used the term "nationality." This was a misuse of the term, as both Mr. Bagby and Mr. Davis are American. After reviewing the questions and their context, we find nothing to support an inference of racial bias in the prosecutor's misuse of the term.

Mr. Bagby also argues that the prosecutor appealed to racial stereotypes that Black men mistreat animals. Arguably, the prosecutor's questions to Mr. Bagby were an awkward attempt to build rapport at the beginning of a cross-examination. The prosecutor accepted Mr. Bagby's answer that he loved his dog and complimented him. We disagree with Mr. Bagby's argument that these questions played into a racial stereotype that Black men mistreat animals.

Here, the prosecutor's questions do not reflect racism or stereotypes nor do they reflect flagrant or ill-intentioned misconduct. Mr. Bagby's prosecutorial misconduct claims were thus waived by counsel's failure to object and we do not review them.

VOLUNTARY INTOXICATION INSTRUCTION

Mr. Bagby contends the trial court erred by giving the jury the standard voluntary intoxication instruction. He complains that the instruction is confusing and misled the jury. We decline to review this claim of error.

The invited error doctrine "prohibits a party from setting up an error at trial and then complaining of it on appeal." *State v. Pam*, 101 Wn.2d 507, 511, 680 P.2d 762 (1984), *overruled on other grounds by State v. Olson*, 126 Wn.2d 315, 893 P.2d 629 (1995). This doctrine precludes a party who requested an instruction to later complain of it on appeal. *State v. Studd*, 137 Wn.2d 533, 546-47, 973 P.2d 1049 (1999). Here, Mr. Bagby requested the standard voluntary intoxication instruction and the trial court gave it. He may not complain of it on appeal.

No. 36530-1-III
*State v. Bagby*

Affirmed.

A majority of the panel has determined this opinion will not be printed in the

Washington Appellate Reports, but it will be filed for public record pursuant to

RCW 2.06.040.

_____
Lawrence-Berrey, J.

WE CONCUR:

_____          _____
Pennell, C.J.                                                  Staab, J.

12