# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| STATE OF WASHINGTON, | DIVISION ONE |
|---|---|
| Respondent, | No. 78591-5-I (consol. with No. 78660-1-I) |
| v. | |
| CRISTIAN ALEXANDER QUIJAS, | PUBLISHED OPINION |
| Appellant. | FILED: February 18, 2020 |

DWYER, J. — Cristian Quijas, born on November 27, 2001, was a juvenile when he was charged with murder in the second degree. After a hearing on the State's motion for a discretionary decline, Quijas was declined to superior court, where he pled guilty and was sentenced. He now appeals from the decline order. Because the juvenile court did not rule on Quijas's claim that the decline proceeding was improperly influenced by implicit or explicit racial bias, and because Quijas is now an adult, we reverse and remand to the superior court for a new hearing on whether declination was appropriate.

I

In March 2017, Cristian Quijas was 15 years old and living with his mother in Burlington. He was a member of a local gang, the Sureños (Southsiders), which had a rivalry with another gang, the Norteños (Northsiders). Angel Estrada, a member of the Northsiders, was the boyfriend of Quijas's sister, C.Q. Quijas took issue with Estrada dating his sister, as did other members of the Southsiders. Estrada was 17 years old in March 2017.

On March 30, 2017, Marcia Thompson, the mother of Quijas and C.Q., agreed to babysit C.Q.'s infant child while C.Q. spent time with Estrada. C.Q., accompanied by Estrada, drove to Thompson's apartment to drop off the child. The apartment was located on a residential street. C.Q. entered the home. Estrada stayed outside in the vehicle C.Q. had driven because Quijas and Daniel Gracidas, another Southsider, were inside the apartment.

Quijas attempted to go outside to confront Estrada but was restrained by Thompson. After C.Q. returned to the vehicle and began to drive away, Quijas and Gracidas ran out of the apartment and began chasing the car. C.Q. was aware that Gracidas had given Quijas a handgun earlier that evening.

C.Q. pulled over when Estrada attempted to exit the moving vehicle in order to confront Quijas and Gracidas. Quijas and Estrada began a physical altercation, during which C.Q. heard Quijas call Estrada a "fucking buster"— "buster" being a slang term for a rival gang member—and yell "die, buster bitch." During the fight, Quijas produced the handgun and shot Estrada twice. After Estrada collapsed to the ground, Quijas shot him thrice more. Five bullets were later removed from Estrada's body. Quijas and Gracidas fled the scene, but Quijas was soon thereafter arrested at the residence of an adult Southsiders member.

On April 4, 2017, Quijas was charged with murder in the second degree in juvenile court. On that same day, the State filed a motion for discretionary decline to adult court. The five-day decline hearing commenced on October 11, 2017.

2

At the hearing, the juvenile court heard testimony from officers of the Burlington and Mount Vernon Police Departments, Quijas's probation officer, Burlington-Edison High School's assistant principal, a Department of Corrections officer, and defense expert Dr. Ronald Roesch, a psychologist. Through this testimony, the court learned that Quijas had associated with the Southsiders gang since the age of 12 and, from this age forward, he had a series of problematic encounters with law enforcement.

At 12, Quijas was arrested for stealing paint and painting gang graffiti on property and vehicles. At 13, when police contacted him and other juveniles smoking marijuana, he brandished a knife and was arrested for obstructing. Also at 13, he was charged with theft. Thereafter, he accrued numerous violations of court orders, including orders to not trespass at a local mall, to not possess weapons or gang attire, and not to be outside home unsupervised. The court heard testimony that Quijas sought out firearms, used both marijuana and pills, and got into fights at school.

Quijas did not attempt to justify his actions with regard to killing Estrada but argued for retention of juvenile court jurisdiction. Dr. Roesch noted the adverse effect of a broken home on Quijas's psychological development—Quijas's father was deported when Quijas was seven years old—and testified that Quijas's gang activity suggested a lack of capacity to appreciate the consequences of his actions and a juvenile desire to fit in with his peers.

In his briefing on the motion for discretionary decline, Quijas, who is Hispanic, also alleged that juvenile court jurisdiction is declined, both in Skagit

3

County and statewide, in a racially disproportionate manner. The primary evidence for this contention was a 2014 bulletin by the Washington State Partnership Council on Juvenile Justice, which stated that, despite youths of color comprising only one-third of Washington's youth population, black and Hispanic youths alone comprised 55.7 percent of the state's discretionary juvenile decline cases.[1] Quijas's attorney also presented evidence that, between 2008 and 2017, Hispanic youths in Skagit County made up 34 percent of the local school population but 79 percent of the youth declined from juvenile court. Also according to these statistics, only 21 percent of Hispanic youths in the county had their cases sent back to juvenile court from the superior court after an automatic decline, compared with 30 percent of white youths.[2] However, only 4 of the 53 cases on record involved discretionary declines, while 12 of the 53 saw no disposition at all.

On October 27, 2017, the juvenile court entered its findings of fact and conclusions of law and granted the motion for discretionary decline. The court did not, however, anywhere in its decision, acknowledge Quijas's proffered evidence of discriminatory practices. Nowhere did it address the assertions of implicit or explicit bias raised by the admitted evidence. After his case was

---

[1] WASH. STATE P'SHIP COUNCIL ON JUVENILE JUSTICE, A SUMMARY OF WASHINGTON STATE DATA AND RECENT STUDY FINDINGS: THE TRANSFER OF YOUTH (UNDER AGE 18) TO THE ADULT CRIMINAL JUSTICE SYSTEM (undated), https://www.dcyf.wa.gov/sites/default/files/pdf/decline_Final.pdf [https://perma.cc/5C5T-XRT7].

[2] RCW 13.04.030(e)(v)(A) through (C) list offenses that warrant automatic decline from juvenile to adult court. RCW 13.04.030(e)(v)(C)(III) provides that, in cases when a juvenile has been automatically declined to adult court, "[t]he prosecutor and respondent may agree to juvenile court jurisdiction and waive application of exclusive adult criminal jurisdiction in (e)(v)(A) through (C) of this subsection and remove the proceeding back to juvenile court with the court's approval."

directed to the superior court, Quijas entered a plea of guilty. On June 19, 2018, the court sentenced Quijas to confinement for 180 months. Quijas now appeals the juvenile court's decision on the motion for discretionary decline.

II

Quijas contends that the juvenile court erred by declining jurisdiction. He asserts that the court based its decision solely on the seriousness of the crime with which Quijas was charged. We disagree. The record demonstrates that the juvenile court considered each of the eight required factors and that substantial evidence supports the court's finding with respect to each factor.

A juvenile court's decision to decline jurisdiction is discretionary and is subject to reversal only when it is manifestly unreasonable or based on clearly untenable grounds. State v. M.A., 106 Wn. App. 493, 498, 23 P.3d 508 (2001). The court's factual findings will not be reversed if they are supported by substantial evidence. M.A., 106 Wn. App. at 498. Substantial evidence is that which is sufficient to persuade a fair-minded, rational person of the truth of the premise. State v. Ware, 111 Wn. App. 738, 742, 46 P.3d 280 (2002).

RCW 13.40.110(3) states:

> The court after a decline hearing may order the case transferred for adult criminal prosecution upon a finding that the declination would be in the best interest of the juvenile or the public. The court shall consider the relevant reports, facts, opinions, and arguments presented by the parties and their counsel.

The State has the burden of proving by a preponderance of the evidence that declining jurisdiction is in the best interest of the juvenile or the public. State v. Massey, 60 Wn. App. 131, 137, 803 P.2d 340 (1990). In determining whether

to decline jurisdiction, the juvenile court must consider eight factors, originally enumerated by the United States Supreme Court in Kent v. United States, 383 U.S. 541, 566-67, 86 S. Ct. 1045, 16 L. Ed. 2d 84 (1966).  Our Supreme Court has adopted the Kent factors to govern decline hearings in Washington.  See State v. Williams, 75 Wn.2d 604, 606-07, 453 P.2d 418 (1969); see also Massey, 60 Wn. App. at 137.

> The Kent factors are:
>
> (1) the seriousness of the alleged offense and whether the protection of the community requires waiver; (2) whether the alleged offense was committed in an aggressive, violent, premeditated or willful manner; (3) whether the alleged offense was against persons or against property; (4) the prosecutive merit of the complaint; (5) the desirability of trial and disposition of the entire offense in one court when the juvenile's accomplice in the alleged offense are adults; (6) the juvenile's sophistication and maturity as determined by consideration of his or her home, environmental situation, emotional attitude, and pattern of living; (7) the juvenile's record and previous history; and (8) the prospects for adequate protection of the public and the likelihood of reasonable rehabilitation of the juvenile by the use of procedures, services, and facilities available in the juvenile court.

M.A., 106 Wn. App. at 497-98.

Not all eight of the Kent factors must be proved in order to justify declination.  However, the juvenile court's failure to give appropriate consideration to the Kent factors constitutes an abuse of discretion.  M.A., 106 Wn. App. at 498.  "This court examines the entire record, including the court's oral opinion, to determine the sufficiency of the court's reasons for declination." State v. H.O., 119 Wn. App. 549, 556, 81 P.3d 883 (2003).

Quijas asserts that the juvenile court erred by concluding that the State had proved that transfer to adult court would be in the best interest of Quijas or

the public. He contends that the court "relied on the seriousness of the offense, by itself, to decline" jurisdiction. The record, however, establishes that the juvenile court gave appropriate consideration to each of the Kent factors. Moreover, the record amply supports the trial court's findings.

Quijas's argument is premised on the court's finding that

the State has proven by a preponderance of the evidence that declination would be in the best interests of the public. The Court also finds that the Kent factor #1 is sufficient, by itself, to justify declination to adult status.

The court's analysis of Kent factor 1, the seriousness of the offense, considered both the nature of the charged offense—murder in the second degree—and the circumstances unique to Quijas's alleged actions. There was evidence Quijas sought out a firearm, desired to hunt "chaps" and, when presented with the opportunity, fired six bullets (five of which were recovered from Estrada's body) in a residential neighborhood. The court found that "heightened protection from this type of activity in our community" was necessary. However, although the court did state that the seriousness of the offense would alone be sufficient to justify declination, it did not, in fact, base its decision solely on this factor. Instead, the court analyzed each Kent factor thoroughly.

Quijas appears to argue that juvenile courts must place greater weight on the final three Kent factors because they account for the circumstances of the individual, something that he avers has assumed greater importance in the half century since the Kent decision due to new research on child and adolescent psychology. In fact, the juvenile court found that each of these factors weighed

7

in favor of declining jurisdiction. Considering the sixth Kent factor, the court found that Quijas, from age 12,

> has shown a sophisticated gang affiliation and unhealthy attitude towards police officers. He has been aggressive towards law enforcement, given false identities, and gave credit to someone who shot a local police officer. . . . He's solicited drugs to sell, is addicted to marijuana, and spoke of killing rival gang members. He has not been scared to miss school, do poorly in school, lie to police or violate probation and court conditions. He has not shown to be empathetic or remorseful for his actions or gang lifestyle. Respondent is street smart and gang smart.

In reaching its decision, the court did consider the body of scientific evidence regarding juvenile brain development and the effect of incomplete brain development on culpability. Nonetheless, it found that the evidence of Quijas's relative sophistication and maturity weighed in favor of declination.

As to the seventh Kent factor, the court considered Quijas's history in the juvenile justice system. This included convictions for gang-related malicious mischief in the second degree and theft in the third degree, violations of probation conditions incurred in connection with these convictions, and contacts with law enforcement that included truancy, trespass, drug use, assault, and lying to police. All of this, the court held, weighed in favor of declining jurisdiction.

As to the eighth factor, the court carefully considered the testimony of defense expert Dr. Ronald Roesch. Dr. Roesch did not opine on Quijas's relative level of risk to reoffend upon release from a juvenile rehabilitation administration (JRA) facility or from adult prison, but the court took note of his statement that Quijas "is amenable to treatment, has done well in detention pending this proceeding, wants to leave the gang, and has family support."

8

The court also noted that "the policy of the [JRA] is to release as early as possible," that Quijas could be released into the community after serving only a portion of a standard-range sentence, and that he could be transferred to a "supervised, but . . . not locked down" community facility. The court contrasted this with the options that would be available were Quijas declined to adult jurisdiction, including the Youthful Offender Program, which would allow Quijas to serve his sentence in a JRA facility until at least age 18 (and possibly age 21). In addition, he would "have opportunities of treatment, vocational programs, transition back into society assistance and DOC community custody for up to 36 months." The court determined that, while declination carried its own attendant set of risks, the uncertainty of a sentence available at a JRA facility and of the relative likelihood of recidivism, weighed in favor of declining jurisdiction.

As to Kent factors 2, 3, and 4—respectively, whether the commission of the offense was aggressive, violent, premeditated or willful, whether the crime was against a person as opposed to property, and whether the case had prosecutive merit—the court found each to weigh in favor of decline. Its analysis of factor 2 was colored by evidence of Quijas's anger at a rival gang member dating his sister, of his aggression in the encounter that led to Estrada's death, and of his shooting Estrada multiple times in the back while yelling "die, buster bitch." The offense was indeed committed against a person, resulting in the person's death. The court found that the prosecutive merit of the case was bolstered by Quijas's social media presence, through which he "wrote of

obtaining a gun and that 'it was his turn . . . to start smoking chaps . . . just pushing a button . . . that's all that is'" and told his sister to "pray for Estrada."[3]

Not all eight of the <u>Kent</u> factors must be established in order to justify declination. <u>M.A.</u>, 106 Wn. App. at 498. Thus, it is not beyond the realm of possibility or legality that a court, after duly considering each factor, could find a single factor sufficient on its own to justify a decline. However, the record herein reflects that the juvenile court considered all of the <u>Kent</u> factors as required, <u>M.A.</u>, 106 Wn. App. at 498, and that substantial evidence supports the court's findings. <u>Ware</u>, 111 Wn. App. at 742. Because the juvenile court's decision was not based on manifestly unreasonable grounds, <u>M.A.</u>, 106 Wn. App. at 498, the court did not abuse its discretion in this regard. Quijas's assertion to the contrary is unavailing.

III

A

The next issue is whether the juvenile court was required to rule on Quijas's claim that the declination process was tainted by racial prejudice. It was.

This omission does not pertain to any of the <u>Kent</u> considerations. Rather, Quijas assigns error to the court's omission of any ruling or discussion of his evidence concerning the effect of racial bias in juvenile court decline

---

[3] The court found that the fifth Kent factor—judicial efficiency when the juvenile's associate in the offense is an adult—did not apply, as Gracidas, 17 years old at the time of the shooting, had already been sentenced as an adult.

determinations, both in Skagit County and statewide. This omission, he avers, left unanswered his claim that racial bias influenced this proceeding.

In his briefing before the juvenile court, Quijas alleged that

> in Washington State, and locally in Skagit County, Hispanic youth are being declined and tried in adult court at a rate disproportionate to their percentage of the population. This should be a concern to the court, as *it raises both equal protection and due process concerns*. As we know that declining a youth increases their chances of recidivism, by declining Hispanic youth we are contributing to the further racial disparity seen in the adult prison population.

(Emphasis added.)

Article I, section 12 of our state constitution provides: "No law shall be passed granting to any citizen, class of citizens, or corporation other than municipal, privileges or immunities which upon the same terms shall not equally belong to all citizens, or corporations." The Fourteenth Amendment to the federal constitution provides: "No State shall . . . deny . . . any person within its jurisdiction the equal protection of the laws." U.S. CONST. AMEND. XIV, § 1. Our Supreme Court has held that the equal protection clause of article I, section 12 and that of the Fourteenth Amendment are substantially identical and subject to the same analysis. State v. Shawn P., 122 Wn.2d 553, 559-60, 859 P.2d 1220 (1993); see also State v. Dhaliwal, 150 Wn.2d 559, 581-83, 79 P.3d 432 (2003) (Chambers, J., concurring) (racial bias antithetical to a fair and impartial proceeding and violates federal due process and equal protection rights).

"[I]t is essential that once a claim of racial bias is raised, investigations into allegations of racial bias are conducted on the record and with the oversight of the court." State v. Berhe, 193 Wn.2d 647, 661, 444 P.3d 1172 (2019). In the

context of jury trials, the Supreme Court has made clear that an allegation of explicit or implicit bias at any stage of a proceeding impugns a defendant's Sixth Amendment right to an impartial jury.

Thus, in State v. Monday, 171 Wn.2d 667, 257 P.3d 551 (2011), the Supreme Court held that a defendant's right to an impartial jury was fatally undermined by appeals to racial bias. Therein, a prosecutor attempted to discredit African-American witnesses in a murder trial by repeatedly adopting an exaggerated pronunciation of "'police'" as "'po-leese'" and intimating, or outright stating, that these witnesses followed a "code" that dictated "'black folk don't testify against black folk.'" Monday, 171 Wn.2d at 678-79. The court held that this was prosecutorial misconduct incapable of remedy by a curative instruction, stating:

> In this case, we cannot say beyond a reasonable doubt that the error did not contribute to the verdicts. The prosecutor's misconduct tainted nearly every lay witness's testimony. It planted the seed in the jury's mind that most of the witnesses were, at best, shading the truth to benefit the defendant.

Monday, 171 Wn.2d at 681.

"The fact of racial and ethnic disproportionality in our criminal justice system is indisputable." TASK FORCE ON RACE & CRIMINAL JUSTICE SYS., PRELIMINARY REPORT ON RACE AND WASHINGTON'S CRIMINAL JUSTICE SYSTEM 1 (2011) [https://perma.cc/GP5C-VQ85]. Our Supreme Court has made clear that trial courts must be vigilant in addressing the threat of explicit or implicit racial bias that affects a defendant's right to a fair trial. We hold that equal vigilance is required when racial bias is alleged to undermine a criminal defendant's

constitutional rights at any stage of a proceeding. When confronted by such a claim, supported by some evidence in the record, the trial court must rule. It cannot ignore the evidence or the claim. And we cannot affirm the result of a proceeding in which such a necessary ruling is absent.[4]

B

The juvenile court did not rule on Quijas's claim of racial bias. This renders the declination decision defective. What is the proper remedy?

This question is complicated by Quijas's attainment, in the intervening period since the decline hearing, of the age of majority. Such a situation confronted the Supreme Court in Dillenburg v. Maxwell, 70 Wn.2d 331, 422 P.2d 783 (1967). The relevant facts of that case, and the rule set forth in its holding, have been summarized as follows:

> In Dillenburg, 70 Wn.2d at 333, the petitioner filed for a writ of habeas corpus in superior court, arguing he was improperly tried in adult court. This court initially concluded that the petitioner had been improperly transferred to adult court and reversed for a new trial. Id. at 345-46. However, upon reconsideration, the court concluded that where the petitioner has demonstrated that a transfer from juvenile court was faulty, the proper remedy is a de novo hearing in superior court on whether declination of juvenile jurisdiction would have been appropriate. Id. at 355. If declination would have been appropriate, then the conviction stands. Id. Otherwise, the conviction is set aside and a new trial must occur in

---

[4] The State postulates that the juvenile court "presumably considered" Quijas's argument regarding racial bias and evidence of disproportionality but concluded that the evidence was insufficient to merit any consideration on the record. However, with no reference whatsoever to this issue or the evidence in the trial court's findings and conclusions, we lack any indication that the juvenile court adopted any position on the question. Indeed, in arguing otherwise, the State substitutes its own evaluation of the evidence for the nonexistent findings of the trial court. "This court is not in a position to speculate about what *might* have happened" at the trial court level. State v. Dye, 178 Wn.2d 541, 556, 309 P.3d 1192 (2013). When an allegation of racial bias—either implicit or explicit—is both made and supported by some evidence, the trial court must rule. This court did not.

adult criminal court if the defendant has since turned 18. Id. at 356. Subsequently, Washington courts have consistently applied this remedy when lack of adult criminal jurisdiction is successfully argued on appeal. See [State v. ]Mendoza-Lopez, 105 Wn. App. [382,] 390[, 19 P.3d 1123 (2001)]; [State v. ]Anderson, 83 Wn. App. [515,] 522[, 922 P.2d 163 (1996)].

In re Pers. Restraint of Dalluge, 152 Wn.2d 772, 785-86, 100 P.3d 279 (2004) (footnote omitted). Our Supreme Court applied that very remedy in Dalluge, 152 Wn.2d at 786-87.

Thus, when a juvenile is convicted and sentenced as an adult but, after attaining the age of majority, demonstrates that an order of decline was entered improperly, the Dillenburg remedy applies. Dalluge, 152 Wn.2d at 786-87. Quijas has shown that the transfer of his case to adult court was done improperly because his claim of racial bias was never addressed by the juvenile court. Thus, we remand the matter to superior court for further proceedings consistent with this opinion.

Reversed in part and remanded.

WE CONCUR: