IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | No. 39959-1-III |
| | ) | |
| Respondent, | ) | |
| | ) | |
| v. | ) | UNPUBLISHED OPINION |
| | ) | |
| MICHAEL E. VASSAR, | ) | |
| | ) | |
| Appellant. | ) | |

MURPHY, J. — A jury found Michael Vassar guilty of violating a no-contact order. On appeal, Vassar claims (1) the trial court erred by failing to suppress evidence that had been gathered during a pretextual traffic stop, and (2) the prosecutor committed misconduct during closing argument.

We disagree and affirm.

FACTS

*Traffic stop*

Michael Vassar was subject to a protection order restricting contact with Latonya Lovelace.

Spokane County Sheriff Deputy Ryan Trim, who was on patrol with a field training officer, observed a Dodge Durango with a faulty rear turn signal and initiated a

traffic stop. Trim identified the driver as Michael Vassar and the passenger as Latonya

Lovelace. In communicating with dispatch, Trim was notified of a no-contact order

between Vassar and Lovelace. During the officer contact, Vassar admitted that he knew

the order was in place. Vassar was subsequently arrested for violating the no-contact

order.

*Motion to suppress*

Vassar alleged that the traffic stop was unlawful. He filed a CrR 3.6 motion to

suppress all evidence obtained during the stop. The only witness to testify during this

hearing was Deputy Trim. Trim stated that the traffic stop was initiated after he observed

the rear turn signal was dim and blinking significantly faster than the 60 to 120 blinks per

minute allowed by law. It was nighttime and raining at the time of the stop. The side

windows of the vehicle were tinted and the rear windows, which were not tinted, were

blocked by items inside the vehicle. Given the nighttime darkness, the tinted windows,

and the items obstructing a view into the interior of the vehicle, Trim could not see into

the vehicle to view the occupants prior to stopping the vehicle.

When contact was made, the passenger, Latonya Lovelace, who was the registered

owner of the vehicle, stated to Deputy Trim that she knew the rear blinker needed to be

fixed. In response to questions posed during the CrR 3.6 hearing, Trim testified that he

was not able to see inside the vehicle to know the race or gender of either Vassar or

Lovelace prior to initiating the traffic stop. He was also unaware of any pending investigations or known criminal activities at the time that he initiated the stop. Trim testified that he did not have a motive or any other reason to conduct the traffic stop, beyond the faulty rear turn blinker.

Vassar did not testify at the hearing but did submit a written declaration that was appended to his motion to suppress. Vassar presented a version of events that included turning into a church parking lot, traveling 360 degrees to then face the street and that the law enforcement officer looked at Vassar, drove past Vassar, and then made a left turn into the same church parking lot. According to Vassar, the officer entered the church parking lot from the back, parked, and watched Vassar's vehicle. Vassar further declared that the passengers in his vehicle exited, with Vassar then leaving the parking lot and turning right, and the officer following thereafter. Vassar stated the officer activated the police car's lights to get a car in between them to move. Then, the officer sped up to catch Vassar to initiate the stop.

At the conclusion of Deputy Trim's hearing testimony, counsel moved to argument on the motion to suppress. Defense counsel started their argument by indicating they would be referring to Vassar's declaration during argument. Counsel pointed out that Vassar's declaration recited a different version of events than those recounted by Deputy Trim at the hearing. The trial court confirmed that it had read Vassar's

3

declaration and noted that defense counsel did not ask Deputy Trim during cross-examination about any information contained within the declaration.

The trial court denied Vassar's motion to suppress. During its oral ruling, the trial court identified case law that upholds as lawful traffic stops conducted for technical violations, such as having a defective turn signal light. In this instance, the trial court found it credible that there was no reason for the traffic stop other than the violation of a regulation. The trial court went on to address Vassar's allegation that this stop was pretextual. The court also addressed Vassar's declaration, noting again that defense counsel did not ask Deputy Trim any questions about the declaration, and because Vassar exercised his right not to testify, there was no opportunity to cross-examine Vassar on the contents of his declaration. As such, the trial court did not give much weight to the declaration.

In addition, the trial court addressed the defense's argument that referred to the Supreme Court's decision in *State v. Sum*, 199 Wn.2d 627, 511 P.3d 92 (2022). The court quoted language from *Sum* that "'[i]t's no secret that people of color are disproportionate victims of law enforcement scrutiny'" but, in this instance, the court "[did not] find any

facts that would support that that occurred." Rep. of Proc. (RP) (July 27, 2023) at 52.[1]

The trial court further stated that "there's nothing, no facts, nothing to support that

[race] was related to this specific stop." RP (July 27, 2023) at 52. The court commented

that it had reviewed the "body cam" video and acknowledged that Deputy Trim's conduct

during the traffic stop was "extremely professional." RP (July 27, 2023) at 45.

The trial court later entered findings of fact and conclusions of law that state in

relevant part:

> FINDINGS OF FACT:
> . . . .
> 4. At about 3:44 a.m., Deputy Trim spotted a Dodge Durango
> driving on the road. He spotted a Dodge Durango making a turn and
> noticed that the rear turn signal was dim and blinking at a faster than
> normal rate. Specifically, Deputy Trim noted that the light appeared to be
> blinking faster than two times per second. He pulled the Durango over
> based upon the faulty turn signal;
> . . . .
> 13. Deputy Trim could not see Mr. Vassar prior to stopping him. It
> was dark outside at the time of the traffic stop. The Durango had tinted, rear
> passenger windows and the rear window was blocked by items in the rear
> of the Durango, preventing the deputy from seeing Mr. Vassar. Thus, the
> deputy was unaware of Mr. Vassar's race or even his gender before the
> traffic stop;

---

[1] The quote from *Sum* is slightly different from what was stated by the trial court in its oral ruling, with the *Sum* language being: "When it comes to police encounters without reasonable suspicion, 'it is no secret that people of color are disproportionate victims of this type of scrutiny.'" 199 Wn.2d at 644 (quoting *Utah v. Strieff*, 579 U.S. 232, 254, 136 S. Ct. 2056, 195 L. Ed. 2d 400 (2016) (Sotomayor, J., dissenting)).

14. Deputy Trim denied that he pulled Mr. Vassar over because of his race, or because of Ms. Lovelace's race. He further denied pulling the Durango over for any other reason than the turn signal violation;

. . . .

16. The testimony of Deputy Trim was credible;

17. There is no evidence of Deputy Trim stopped the Durango on a pretext to conduct an investigation unrelated to the traffic violation or to conduct an otherwise unauthorized, warrantless search of a person or of any property;

. . . .

CONCLUSIONS OF LAW:

. . . .

3. Deputy Trim thus had a lawful basis to stop based upon reasonable suspicion and probable cause that he had witnessed a turn signal violation;

4. From both an objective and subjective standpoint, the stop in this case was reasonable, authorized by law, and not pretextual;

5. This case is distinguishable from the case cited by the defense, <u>State v. Prado</u>, 145 Wn. App. 646, 186 P.3d 1186 (2008) because that case involved a stop based upon the defendant's driving, rather than the equipment on the defendant's car. In <u>Prado</u>, the defendant's car crossed slightly over the lane divider slightly and nothing about his vehicle or his driver presented a danger to others. In this case, the violation involved defective equipment. The traffic law at issue in <u>Prado</u> was not black and white in that it only required the driver to remain in a certain lane "as nearly as practicable." The law at issue here, on the other hand, is black and white in that it sets forth specific requirements for a turn signal to be legal. The Durango was not in compliance with the regulation requiring turn signals to blink no more than 120 times per minute;

6. The facts do not support a legal conclusion that there was a race-based motive for the traffic stop.

Clerk's Papers (CP) at 167-70 (boldface omitted).

6

*Trial*

Prior to jury selection, defense counsel reiterated an intent to rely on the defense of necessity and included a necessity instruction in their proposed jury instructions.

At trial, during its case-in-chief, the State introduced testimony from Latonya Lovelace and Deputy Trim. Michael Vassar testified during the defense's case-in-chief. Testimony relevant to this appeal includes the following:

*Latonya Lovelace*

On the evening of the traffic stop, Lovelace drove herself, in a Dodge Durango that she owned, to a casino in Airway Heights. She stayed at the casino for several hours and did not meet anyone. As Lovelace was leaving, two friends approached, and asked her for a ride to Spokane Valley. Lovelace identified her friends by their first names but testified she did not know their last names. Lovelace agreed to give her friends a ride but felt uncomfortable driving after it began raining. The rain made her nervous because she did not have her glasses, which she needed to drive at night. Due to her nervousness, she drove to Vassar's residence. Regardless of her awareness of the no-contact order, Lovelace knocked on Vassar's door and asked Vassar to give her friends a ride home. Although Vassar initially expressed that did not want to drive Lovelace's friends, he eventually agreed.

Lovelace testified that it was a 20-minute drive from the casino to where her friends lived in Spokane Valley. She denied having ever driven without her glasses. She did not have money for an Uber to help her friends get home. Her friends did not have driver's licenses. There was no power steering in the Dodge Durango. She recently learned she was pregnant. Lovelace stayed at the casino because she was winning money but later lost the money after continuing to gamble. She was not worried about driving herself home without her glasses because she could get home without needing to read signs. She agreed to give her friends a ride home because she thought she could reach out to another friend to help, but when she could not contact that friend, she went to Vassar. Lovelace did not decline to give her friends a ride when she encountered various issues because her friends had already given her gas money that she had gambled away. Lovelace explained that when she was leaving the casino, her friends approached her to ask for a ride, and that is when they gave her the money, and yet it was after this that she gambled away the gas money they had given her.

After dropping off Lovelace's friends, on the return drive, Vassar and Lovelace were stopped by Deputy Trim. Vassar and Lovelace were the only people in the vehicle at the time of the traffic stop. Lovelace confirmed that she did not tell Deputy Trim she did not have her glasses, which she needed to drive at night, nor that she had asked Vassar to drive.

8

*Deputy Ryan Trim*

During the traffic stop, Deputy Trim asked Vassar for his driver's license, registration, and proof of insurance. Vassar did not have his driver's license. Lovelace volunteered her driver's license and stated that the vehicle was hers. Dispatch notified Deputy Trim of a protection order between Lovelace and Vassar, with that order e-mailed to Trim so he could read it himself.

During the traffic stop, Vassar told Deputy Trim something along the lines of how "they were coming from the casino" and "something about taking some friends from the casino." RP (Aug. 15, 2023) at 200, 212. Vassar told Deputy Trim he knew there was a no-contact order in place prohibiting his contact with Lovelace. Vassar did not mention anything about Lovelace being pregnant, nor about Lovelace needing a ride and not having her glasses, nor that she did not have any money or anyone else to turn to other than Vassar.

*Michael Vassar*

Vassar drove Lovelace and her friends because he was worried about Lovelace's safety due to it being dark outside and that Lovelace did not have her glasses. He could not afford an Uber. Although Vassar knew there was a no-contact order, he agreed to drive Lovelace.

When asked why he told Deputy Trim that he was coming from the casino, Vassar

replied, "[b]ecause that's where I was going." RP (Aug. 15, 2023) at 221. The State

further questioned Vassar regarding why he told Trim he was coming from the casino:

> Q    [PROSECUTOR] That's where you were coming from?
> A    That's not where I was coming from, but that was basically, you know, the I guess I could say I was mapped out for where it all started.
>         The whole reason why I was behind was the first place because she had friends that came from the casino. She was coming from the casino. She stopped by, and she had asked me could I help due to, you know, she didn't have any glasses, and it was dark, and it was raining.
>         Plus she doesn't have power steering in the Durango, so it's a bit tough to drive.
> Q    But why did you say that you were coming from the casino to Deputy Trim? Let me say it more specifically I guess. Why did you say we were coming from the casino, including yourself in that statement?
> A    First thing came to mind I mean. Although I wasn't with them at the casino, I was at home.

RP (Aug. 15, 2023) at 221-22.

*Jury instructions*

Vassar took the position at trial that it was necessary for him to violate the

no-contact order to minimize or prevent a greater harm to Latonya Lovelace. Vassar

proposed, and received, the following instruction on a necessity defense:

> Necessity is a defense to a charge of violation of a court order if:
> (1)  the defendant reasonably believed the commission of the crime was necessary to avoid or minimize a harm;
> (2)  harm sought to be avoided was greater than the harm resulting from a violation of the law;
> (3)  the threatened harm was not brought about by the defendant; and

10

(4) no reasonable legal alternative existed.

The defendant has the burden of proving this defense by a preponderance of the evidence.

Preponderance of the evidence means that you must be persuaded, considering all the evidence in the case, that it is more probably true than not true.

If you find the defendant has established this defense, it will be your duty to return a verdict of not guilty to this charge.

CP at 201 (Instr. 10)

*State's closing argument*

During closing argument, the prosecution stated the following:

Mr. Vassar was not obliged to drive her anywhere. He could have said no. He could have arranged for one of his own friends or somebody else to do something or he could have simply said you folks need to find your own way home. Ms. Lovelace has already said that her house is close enough to my house. She can get there safely. She could have done so without placing herself in any danger whatsoever. This wasn't the only alternative that was available to these folks.

The next question for you, though, is is this affirmative defense even true? Should you take it at face value or is it more likely that what actually happened that night is that *Ms. Lovelace and Mr. Vassar were at that casino there together, they were there voluntarily*, that that's why Mr. Vassar said to the police right when he was contacted we're coming from the casino. We're dropping off some friends.

You saw him struggle with that question on the stand and it's a very simple question, and you are allowed when you're assessing the credibility of a witness to look at the way they testify about something on the stand.

You're, also, allowed to consider the fact that Mr. Vassar was previously convicted of a theft charge in assessing his credibility. Under the law, crimes of theft, crimes of dishonesty are considered admissible so that a jury can weigh them against the defendant's credibility and see if that crime bears on that defendant's ability or willingness to say something that's truthful, and that's what the instruction on theft is all about.

11

I'd suggest to you that what's going on here is Mr. Vassar is trying to put the best face on this that he possibly can, but *that what actually happened was he and Ms. Lovelace were on a date. They were out. They were having fun. The night got late. That's why Ms. Lovelace wasn't worried about having her glasses. She knew he was going to drive her. That's why she didn't worry about gambling for hours and letting it get dark outside because he was with her, and she knew he was going to drive, and that's why she had no concerns about her ability to get home.*
I'll suggest to you that *the entire story about she and her friends is something that's made up after the fact to try to explain away or give a good reason for the violation of this no contact order.*

RP (Aug. 15, 2023) at 243-45 (emphasis added).

*Verdict*

The jury found Vassar guilty of violating the no-contact order.

## ANALYSIS

*CrR 3.6 motion to suppress evidence*

Vassar assigns error to the trial court's denial of his CrR 3.6 motion to suppress evidence, specifically to the trial court's findings of fact 4, 13, 14, 16, and 17 as not supported by substantial evidence, and challenging conclusions of law 3, 4, 5, and 6.[2] We disagree.

---

[2] While Vassar asserts that the trial court's findings of fact are not supported by substantial evidence, his briefing argues only that critical facts contained in Vassar's declaration were contrary to the trial court's findings of fact, not that no substantial evidence supported the specific findings of fact where Vassar assigned error.

"We review the denial of a motion to suppress for substantial evidence supporting the trial court's findings of fact and whether the findings of fact support the trial court's conclusions of law, and we review the trial court's conclusions of law de novo." *State v. Teulilo*, 1 Wn.3d 595, 602-03, 530 P.3d 195 (2023); *see also State v. Arreola*, 176 Wn.2d 284, 291, 290 P.3d 983 (2012). Substantial evidence exists when there is a sufficient quantity of evidence to persuade a fair-minded, rational person of the truth of the finding. *State v. Anderson*, 200 Wn.2d 266, 286, 516 P.3d 1213 (2022). "The trial court is tasked with resolving issues of credibility and weighing evidence, and we give great deference to its factual findings." *State v. Taylor*, 29 Wn. App. 2d 319, 328, 541 P.3d 1061, *review denied*, 3 Wn.3d 1003, 549 P.3d 116 (2024).

### Findings of fact from the traffic stop

Our state constitution "protects the 'private affairs' of each person from disturbance imposed without 'authority of law.'" *Arreola*, 176 Wn.2d at 291 (quoting WASH. CONST. art. I, § 7). The general rule in Washington is that warrantless searches are per se unreasonable. *State v. Ladson*, 138 Wn.2d 343, 349, 979 P.2d 833 (1999). There are exceptions to the warrant requirement, and it is the burden of the State to prove that an exception to the warrant requirement applies. *See State v. Hendrickson*, 129 Wn.2d 61, 70, 917 P.2d 563 (1996). With a traffic stop, the question is "whether the fact that someone has committed a traffic offense, such as failing to signal or eating while driving,

13

justifies a warrantless seizure which would not otherwise be permitted absent that

'authority of law' represented by a warrant." *Ladson*, 138 Wn.2d at 352 (footnote

omitted).

"A pretextual traffic stop occurs when a police officer relies on some legal

authorization as 'a mere pretext to dispense with [a] warrant when the true reason for the

seizure is not exempt from the warrant requirement.'" *Arreola*, 176 Wn.2d at 294

(quoting *Ladson*, 138 Wn.2d at 358). "When determining whether a given stop is

pretextual, the court should consider the totality of the circumstances, including both the

subjective intent of the officer as well as the objective reasonableness of the officer's

behavior." *Ladson*, 138 Wn.2d at 358-59.

Deputy Trim testified he performed the traffic stop because the rear turn signal

was dim and blinking significantly faster than the authorized 60 to 120 blinks per minute.

Trim testified it was nighttime, the windows on the vehicle were tinted, and the rear

windows were blocked by items. It was Trim's testimony that he could not see into the

vehicle, and, therefore, could not see the gender or race of the people inside prior to the

stop. Deputy Trim testified there was no reason for the traffic stop other than the faulty

turn signal. There was no open investigation or criminal activities associated with the

vehicle. There was no motive for the traffic stop other than the faulty turn signal. The

trial court found Deputy Trim credible.

We disagree with Vassar's assertion that the trial court erred "in omitting from its findings of fact and conclusions of law critical evidence contained in Mr. Vassar's signed declaration regarding specific details leading up to the traffic stop." Br. of the Appellant at 4.

> As an appellate tribunal, we are not entitled to weigh either the evidence or the credibility of witnesses even though we may disagree with the trial court in either regard. The trial court has the witnesses before it and is able to observe them and their demeanor upon the witness stand. It is more capable of resolving questions touching upon both weight and credibility than we are.

*In re Welfare of Sego*, 82 Wn.2d 736, 739-40, 513 P.2d 831 (1973). The trial court discounted Vassar's declaration because defense counsel opted not to ask Deputy Trim any questions regarding the alleged facts from Vassar's declaration and because Vassar was not subject to cross-examination on the declaration. This court declines to make a credibility determination in light of the trial court being in a better position to resolve questions that go to weight and credibility of evidence. It was not error for the trial court to give little weight to unchallenged statements in Vassar's written declaration that were not subject to cross-examination.

There is a sufficient quantity of evidence in the record to persuade a fair-minded, rational person of the truth of findings of fact 4, 13, 14, 16, and 17. *See State v. Hill*, 123 Wn.2d 641, 644, 870 P.2d 313 (1994).

*Conclusions of law*

Vassar argues the trial court erred in its conclusions of law 3, 4, 5, and 6, claiming Deputy Trim (1) lacked a reasonable suspicion for the traffic stop, (2) the traffic stop was pretextual, and (3) the evidence supported racial motivations for the traffic stop. We disagree.

*Reasonable suspicion*

Deputy Trim had a reasonable articulable suspicion of a traffic infraction to perform the traffic stop based on the rear turn signal blinking more than 120 times per minute. WAC 204-21-060(1)(a) states that "[t]urn signal lamps visible to approaching or following drivers must . . . [f]lash at a rate of sixty to one hundred twenty flashes per minute." Violations of WAC 204-21-060 are traffic infractions. *See* RCW 46.37.010(1)(b).

Vassar relies on *Prado*, 145 Wn. App. 646, to argue that even if his turn signal was blinking more than 120 times per minute, the traffic stop was unconstitutional because law enforcement cannot execute an investigatory stop for a minor traffic violation without other safety concerns. *Prado* is distinguishable from this case. The vehicle in *Prado* crossed an eight-inch white line dividing the exit lane from the adjacent lane by approximately two tire widths for one second. *See* 145 Wn. App. at 647. Benjamin Prado was subsequently arrested for driving under the influence. *Id*. The

16

pertinent statute in *Prado* states, "'[a] vehicle shall be driven *as nearly as practicable* entirely within a single lane and shall not be moved from such lane until the driver has first ascertained that such movement can be made with safety.'" *Id.* at 648 (quoting RCW 46.61.140(1)). It was held in *Prado* that a vehicle crossing over a lane once for a second by two widths does not, without more, constitute a traffic violation justifying a stop by a police officer. *Id.* at 647. It was reasoned that the legislature's use of the language "as nearly as practicable" demonstrated a recognition that brief incursions over the lane lines will happen and that crossing a line briefly does not justify a belief that Prado's vehicle was operated unlawfully. *Id.* at 648.

Here, the traffic stop involved defective equipment. As the trial court pointed out, the statute at issue in *Prado* was equivocal in that it required the driver to remain in a certain lane "as nearly as practicable." *Id.* at 648. Conversely, in this case, the traffic regulation sets out the required flash rate at 60 to 120 times per minute. *See Arreola*, 176 Wn.2d at 289-90 (altered exhaust was the actual reason for the stop). The vehicle Vassar was operating did not comply with the regulation that requires a turn signal to blink no more than 120 times per minute. Moreover, Ms. Lovelace, without being asked, offered that she was already aware the turn signal needed to be fixed. With this statement, it is reasonable to assume that every time the vehicle was driven, it was known that the

17

vehicle was being operated unlawfully due to the faulty turn signal. For these reasons, we agree with the trial court that this case is distinguishable from *Prado*.

The trial court did not err in its conclusion of law that Deputy Trim had reasonable suspicion to conduct a traffic stop when he witnessed a turn signal violation.

### *Pretextual stop*

As to Vassar's contention that the traffic stop was pretextual, in looking at the subjective intent and objective circumstances, nothing in the findings of fact or in the record suggests that Deputy Trim had any illegitimate reason for conducting the traffic stop. Rather, the findings of fact support that the stop was performed for a legitimate traffic violation, which was the actual, conscious, and independent cause for the traffic stop, and that Deputy Trim appropriately exercised discretion in initiating the traffic stop. For these reasons, the trial court did not err in its conclusion of law that the stop was not pretextual.

### *Racial motivation*

Alternatively, Vassar argues the stop was motivated by racial bias. Vassar relies on his declaration to argue Deputy Trim drove past his vehicle and was able to see him prior to the traffic stop. The trial court discounted Vassar's declaration and, instead, found Deputy Trim credible when Deputy Trim testified he could not see the race or gender of any occupant of the vehicle prior to conducting the traffic stop. Based on the

evidence that the darkness, the tinted windows, and the obstructed windows blocked

Deputy Trim's visibility into the vehicle, the credible evidence is that the traffic stop was

performed for a turn signal violation. The trial court did not err in its conclusion of law

that the evidence did not support a claim that there was a race-based motivation for the

traffic stop.

*GR 37*

Vassar suggests this court should review the traffic stop through an examination of

the GR 37 framework, while concurrently noting the Supreme Court has not extended

such an examination to a situation like the one presented in this case. Vassar argues that

under the rationale of *Sum*, the GR 37 standard must be applied in the context of a

pretextual stop. Specifically, Vassar claims this court should ask whether an objective

observer through the GR 37 framework could reasonably conclude that race was a

substantial factor in Deputy Trim's execution of the traffic stop.

The State counters that Vassar's reliance on GR 37 is not preserved and this court

should not apply a new test. The State argues Vassar failed to cite to RAP 2.5 or attempt

to demonstrate that the trial court committed a manifest constitutional error. The State

further argues that this court should decline review of this issue because it would not be

possible to demonstrate any error was manifest as no case law requires GR 37 to be

applied to this scenario.

19

In the context that Vassar is alleging error of a constitutional magnitude and whether that claimed error affected his rights at trial, we review Vassar's argument.

In *Sum*, a deputy observed Palla Sum, who "'was slumped over and appeared to be unconscious in the driver's seat.'" 199 Wn.2d at 632. The deputy conducted a "'social contact'" and asked for Sum's driver's license. *Id*. at 632-33. When the deputy walked back to his patrol car to check Sum's name, Sum started his engine and left. *Id*. at 633. Sum was eventually arrested, and the police discovered a pistol in the vehicle. *Id*. at 634. Sum filed a pretrial motion to suppress contending he was unlawfully seized without reasonable suspicion when the deputy requested his identification. *Id*. The motion to suppress was denied. *Id.* at 634-35. The Supreme Court granted review and reversed, holding "courts must consider the race and ethnicity of the allegedly seized person as part of the totality of the circumstances when deciding whether there was a seizure for purposes of article I, section 7 [of the Washington Constitution]." *Id*. at 656. GR 37 was first adopted to "'eliminate the unfair exclusion of potential jurors based on race or ethnicity.'" *Id*. at 649 (quoting GR 37(a)).

"[I]n determining whether there has been a seizure in light of all the circumstances of the encounter, courts may take guidance from some of the circumstances specified in GR 37 . . . ." *Id*. at 653-54. However, "[w]e express no opinion as to whether race and ethnicity might be relevant in determining whether a particular warrantless seizure was

justified by reasonable suspicion or some other exception to the warrant requirement, as that issue is not before us." *Id*. at 643.

The case before us is distinguishable from *Sum*, which addressed whether race was a substantial factor when a seizure occurred in the context of a social contact. Here, Deputy Trim had reasonable suspicion to perform a traffic stop based on a traffic violation. It was expressly stated by the *Sum* court that it was not making a holding or stating an opinion as to whether race or ethnicity may be relevant in determining whether a particular warrantless seizure was justified by reasonable suspicion or some other exception to the warrant requirement. The issue presented in *Sum* is not the issue presented in this case.

We do not address whether the GR 37 standard should apply in this fact pattern because the trial court found that Deputy Trim did not know Vassar's race or gender prior to initiating the traffic stop. This finding is supported by substantial evidence. Therefore, race was not a factor in stopping Vassar.[3]

*State's closing argument*

Vassar argues for the first time on appeal that misconduct occurred during the prosecutor's closing argument, depriving Vassar of his right to a fair trial. Vassar claims the prosecutor committed misconduct by arguing facts unsupported by the evidence and

---

[3] The trial court did address the issue of race in detail at the suppression hearing.

appealing to racial bias to undermine Vassar's and Lovelace's credibility. As such,

Vassar raises two claims of misconduct. One claim is a nonrace-based claim. One claim

is a race-based claim. Different standards of review apply to these claims.

*Inference of being at the casino together*

Vassar asserts the prosecutor stated multiple times during closing argument that

Vassar and Lovelace were on a date together at the casino. Vassar claims this argument

was improper as it was unsupported by the evidence. The State responds that its closing

argument properly relied on the trial testimony and reasonable inferences drawn from that

evidence. We agree with the State.

In the context of closing argument, "misconduct includes making arguments that

are unsupported by the admitted evidence." *In re Pers. Restraint of Yates*, 177 Wn.2d 1,

58, 296 P.3d 872 (2013) (citing *State v. Belgarde*, 110 Wn.2d 504, 505, 508-09, 755 P.2d

174 (1988)). However, "'the prosecuting attorney has wide latitude in making arguments

to the jury and prosecutors are allowed to draw reasonable inferences from the

evidence.'" *Id*. (quoting *State v. Fisher*, 165 Wn.2d 727, 747, 202 P.3d 937 (2009)).

During its closing argument, the State made reasonable inferences from the trial

evidence that Vassar and Lovelace were at the casino together. Deputy Trim testified that

Vassar said "something about they were coming from the casino" during the traffic stop.

RP (Aug. 15, 2023) at 200. Additionally, Lovelace testified that she was giving friends a

22

ride home from the casino, although she did not know the last names of her friends. *Id*. at 179-80. It is reasonable to question whether those friends existed or if Lovelace's statement was made to avoid placing Vassar and Lovelace together at the casino. In addition, when Vassar was asked why he told Deputy Trim he was coming from the casino, Vassar testified, "[b]ecause that's where I was going" with Vassar explaining, "[t]hat's not where I was coming from, but that was basically, you know, the I guess I could say I was mapped out for where it all started." *Id*. at 221-22. Although Vassar denied he was ever at the casino, inferences that Vassar was at the casino with Lovelace were reasonable inferences based on what Vassar told Deputy Trim when he was first pulled over, and, in part, based on Vassar's testimony at trial.

In Vassar's closing argument, defense counsel pointed out that: (1) Lovelace was no longer in a relationship with Vassar and she went to the casino by herself, (2) she met some friends who asked her for a ride, and (3) she drove to Vassar's home to ask Vassar to drive her friends to their house. Vassar testified he was home when Lovelace stopped by and asked for a ride. Deputy Trim could not remember every detail of his interactions with Vassar and Lovelace, but did remember Vassar saying something about coming from the casino and something about taking friends from casino.

Vassar's trial testimony included an effort to explain why he told Deputy Trim why they were coming from the casino and included an answer from Vassar that the

casino was where they were going and that the situation was mapped out as coming from the casino because that was where the events started. Lovelace did not tell Deputy Trim at the time of the stop that she was pregnant, that she had lost the eyeglasses she needed to drive, that she had no money for an Uber, that she did not know her friends' last names, or that she had spent the gas money they had given her even though they had approached her as she was leaving the casino. It was reasonable to infer that Vassar and Lovelace were at the casino together. In line with the inference the State was drawing in its argument, it was a fair inference to question whether it was more likely that Vassar and Lovelace were on a date.

There were no objections to the State's closing argument during trial. The jury was instructed that the lawyers' remarks and arguments were not evidence. Given the necessity defense, it was argued that this defense was not believable, based on the evidence at trial, that a different course could not have been chosen, including (1) having Lovelace's mother, who had a driver's license, drive the friends home, (2) for Vassar to decline to drive Lovelace's car, (3) the adult friends of Lovelace could have figured out their own way home, and (4) Vassar could have driven without Lovelace in the car.

In summary, the State made reasonable inferences based on the evidence that Vassar and Lovelace were at the casino together. Further, the remarks were not so

flagrant and ill-intentioned that they caused an enduring and resulting prejudice that affected the jury's verdict.

### *No improper appeal to racial bias*

On appeal, Vassar also argues that in closing argument, the prosecutor told the jury Vassar and Lovelace "were lying and were on a date together at the casino," which was an "improper appeal to racial bias." Br. of Appellant at 46. Vassar further argues that the prosecutor committed misconduct in closing when they stated that "'the entire story about she and her friends is something that's made up after the fact to try to explain away or give a good reason for the violation of this no contact order.'" Br. of Appellant at 53 (quoting RP (Aug. 15, 2023) at 245). Vassar argues that jurors were invited to question the credibility of Vassar and Lovelace "based on racist stereotypes." Br. of Appellant at 53. Further, when the prosecutor argued Vassar and Lovelace were on a date and having fun despite Lovelace's testimony that they were no longer in a romantic relationship, the prosecutor again invited the jury to question Vassar's and Lovelace's credibility "based on racist stereotypes." Br. of Appellant at 53.

Vassar claimed the prosecutor argued Vassar was lying about the necessity defense because Vassar did not grovel with Deputy Trim and there was "'no testimony about Mr. Vassar talking about I had to do this for the sake of Ms. Lovelace.'" Br. of Appellant at 54 (quoting RP (Aug. 15, 2023) at 245. Instead, Vassar only answered

25

Deputy Trim's questions and did not volunteer information. Vassar argues his conduct during the stop was consistent with "'The Talk' that Black people give their children: they are told to 'keep their composure,' 'be perfectly respectful,' 'ask for permission before moving their hands, and comply with all the officer's requests.'" Br. of Appellant at 54 (quoting *United States v. Knights*, 989 F.3d 1281, 1297 n.8 (11th Cir. 2021)).

As established by the Washington Supreme Court, "prosecutorial misconduct claims involving racial bias are controlled by the 'flagrant or apparently intentional' standard." *State v. Bagby*, 200 Wn.2d 777, 789-90, 522 P.3d 982 (2023) (citing *State v. Monday*, 171 Wn.2d 667, 680, 257 P.3d 551 (2011)). "[T]o prevail on a claim of race-based prosecutorial misconduct, the defendant must demonstrate that the prosecutor's conduct was both improper and prejudicial by showing that they *flagrantly or apparently intentionally* appealed to racial bias in a manner that undermined the defendant's credibility or the presumption of innocence." *Id*. at 790 (citing *Monday*, 171 Wn.2d at 680; *State v. Zamora*, 199 Wn.2d 698, 709, 512 P.3d 512 (2022)). "If the prosecutor's conduct flagrantly or apparently intentionally appealed to racial or ethnic bias, then their improper conduct is considered per se prejudicial and reversal is required." *Id*. (citing *Zamora*, 199 Wn.2d at 715).

The "'gravity of [a] violation of article I, section 22 and Sixth Amendment [to the United States Constitution] principles by a prosecutor's [apparently] intentional appeals

to racial prejudices cannot be minimized or easily rationalized as harmless.'" *Zamora*, 199 Wn.2d at 721 (quoting *Monday*, 171 Wn.2d at 680). "[A]ppeals to racial bias 'necessarily seek to single out one racial minority for different treatment,' thereby 'fundamentally undermin[ing] the principle of equal justice.'" *Id*. (quoting *Monday*, 171 Wn.2d at 680). Our Supreme Court has held that "[n]ot all appeals to racial prejudice are blatant. Perhaps more effective but just as insidious are subtle references. Like wolves in sheep's clothing, a careful word here and there can trigger racial bias." *Monday*, 171 Wn.2d at 678.

However, "[i]n closing argument the prosecuting attorney has wide latitude to argue reasonable inferences from the evidence, including evidence respecting the credibility of witnesses." *State v. Thorgerson*, 172 Wn.2d 438, 448, 258 P.3d 43 (2011). Prosecutors may argue inferences from the evidence, including inferences as to why the jury would want to believe one witness over another. *State v. Copeland*, 130 Wn.2d 244, 290, 922 P.2d 1304 (1996). If the prosecutor does not appeal to racial bias, then the prosecutor may argue reasonable inferences from the evidence, including the credibility of the witnesses.

When analyzing claims of prosecutorial misconduct involving racial bias, the "objective observer standard" is applied. *Bagby*, 200 Wn.2d at 792. The test, established by our Supreme Court, is to "ask whether an objective observer could view the

prosecutor's questions and comments as an appeal to jurors' potential prejudice, bias, or

stereotypes in a manner that undermined the defendant's credibility or the presumption

of innocence." *Id*. at 793 (footnote omitted). Application of the objective observer

standard requires "consider[ation of] (1) the content and subject of the questions and

comments, (2) the frequency of the remarks, (3) the apparent purpose of the statements,

and (4) whether the comments were based on evidence or reasonable inferences in the

record." *Id*. at 794.

Relying primarily on *Monday* and *Henderson v. Thompson*, 200 Wn.2d 417, 518

P.3d 1011 (2022), Vassar claims that the State appealed to racial bias in closing argument

when the following arguments were made:

> I'd suggest to you that what's going on here is Mr. Vassar is trying
> to put the best face on this that he possibly can, but that what actually
> happened was he and Ms. Lovelace were on a date. They were out. They
> were having fun. The night got late. . . .
> I'll suggest to you that the entire story about she and her friends is
> something that's made up after the fact to try to explain away or give a
> good reason for the violation of this no contact order.

RP (Aug. 15, 2023) at 244-45. Vassar claims that the statements invited the jurors to

question the credibility of Vassar and Lovelace based on racial stereotypes.

In *Monday*, the prosecutor cast doubt on the credibility of the witnesses based on

their race when stating, "'[B]lack folk don't testify against [B]lack folk.'" 171 Wn.2d at

28

676. The *Monday* court found the statement "highly improper" and that it constituted race-based misconduct. *Id*. at 679.

In *Henderson*, which is a civil case involving a motor vehicle accident, the attorney for the at-fault driver described Henderson in closing arguments as "'confrontational,'" "'combative,'" and "'not interested in the search for truth.'" 200 Wn.2d at 424-25. At trial, Henderson testified the collision increased symptoms she experienced due to Tourette's syndrome, and that since the accident she had new and more intense tics and severe pain. *Id.* at 424. The only Black people in the courtroom were Henderson, her attorney who was a Black woman, and Henderson's lay witnesses. *Id*. at 422. In closing, the attorney for the at-fault driver argued that the at-fault driver took the stand and felt intimidated and emotional, and the only reason for the trial was Henderson's desire for a financial windfall. *Id*. at 425. The at-fault driver's attorney further argued that Henderson's lay witnesses were "'inherently biased'" and "suggested the [three] Black lay witnesses' shared use of a popular idiom to describe Henderson was a sign of collusion." *Id*. at 425 (all described Henderson prior to the accident as the "'life of the party'"). Following the verdict, Henderson was asked to leave the courtroom before the jury returned with "Henderson and her legal team recall[ing] this coming as a request from the jury." *Id*. at 426.

Henderson moved for a new trial or additur of the jury's verdict on the ground that defense counsel repeatedly appealed to racial bias that affected the verdict. *Id*. at 422. The trial court denied a new trial and did not grant a requested evidentiary hearing. *Id*. The Supreme Court reversed, holding the trial court abused its discretion in not granting an evidentiary hearing and not imposing sanctions. *Id*. at 423. The court reasoned that "[a] trial court *must* hold a hearing on a new trial motion when the proponent makes a prima facie showing that this objective observer could view race as a factor in the verdict, regardless of whether intentional misconduct has been shown or the court believes there is another explanation." *Id*. at 422-23.

The case before the court is distinguishable from *Monday* and *Henderson*. Here, the prosecutor did not use highly improper language, make references to race or ethnicity, set up an us-versus-them dichotomy, or suggest that the Black witnesses were inherently unreliable. In considering the (1) content and subject of the prosecutor's closing remarks, (2) the frequency of the remarks, (3) the apparent purpose of the statements, and (4) whether the comments were based on evidence or reasonable inferences in the record, we find that the prosecutor's statements in closing argument were not flagrantly or apparently intentional in an appeal to racial bias in a way that would undermine the defendant's credibility or the presumption of innocence. *See Bagby*, 200 Wn.2d 788-89.

30

No. 39959-1-III
*State v. Vassar*

Nothing in the record suggested that the State appealed to racial bias during this trial.

## CONCLUSION

We affirm.

A majority of the panel has determined this opinion will not be printed in the Washington Appellate Reports, but it will be filed for public record pursuant to RCW 2.06.040.

_____
Murphy, J.

WE CONCUR:

_____
Lawrence-Berrey, C.J.

_____
Staab, J.

31